**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 2, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MELISSA HARMAN and JUSTIN
OVERTON,

        Plaintiffs - Appellants,

v.

BRENT POLLOCK, Officer,
Department of Public Safety, State
Bureau of Investigations; and SCOTT
BARNETT, Officer, Department of
Public Safety, State Bureau of
Investigations;

        Defendants - Appellees.

No. 04-4294

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:03-CV-558-TC)**

---

Robert B. Sykes (with Kevin M. Sheff on the briefs), Robert B. Sykes &
Associates, P.C., Salt Lake City, Utah, for Plaintiffs-Appellants.

Debra J. Moore (with Nancy L. Kemp, Assistant Attorney General, J. Clifford
Petersen, Assistant Attorney General and Mark L. Shurtleff, Attorney General, on
the brief), Assistant Attorney General, Salt Lake City, Utah, for Defendants-
Appellees.

---

Before **HENRY**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

**PER CURIAM**.

Melissa Harman and Justin Overton rented and resided in the garage apartment at 44 ½ West 2700 South in South Salt Lake, Utah. Defendant Brent Pollock, a narcotics agent with the Utah Department of Public Safety's Bureau of Criminal Investigations, had been investigating and observing the residents of the adjacent 44 West 2700 South for drug dealing. Defendant Scott Barnett was a Sergeant with the Utah Department of Public Safety.

On February 12, 2003, pursuant to a search warrant for 44 West 2700 South, a Special Emergency Response Team (SERT) of the Utah Highway Patrol and Special Weapons and Tactics Team (SWAT) prepared and executed an operations plan that encompassed a midnight raid of both residences. The raid resulted in the detention of the plaintiffs Ms. Harman and Mr. Overton for at least an hour and a half before they were released. As a result, the plaintiffs filed a 42 U.S.C. § 1983 action against defendants, alleging violations of their Fourth Amendment rights to be free from unlawful searches and seizures. The district court granted qualified immunity to each defendant, and dismissed the claims.

The plaintiffs now appeal, and, for the reasons stated below, we affirm in part and reverse in part.

## I. FACTUAL BACKGROUND

A. 44 West 2700 South

Agent Pollock began investigating Ignacio Ascention (known to Agent Pollock at the time only as "Pawoo") and Conception Rodriguez (known to Agent Pollock at the time only as "Isabel") in late July of 2002. He suspected they were dealing heroin and cocaine. Acting undercover, Agent Pollock made several drug purchases from them.

On January 30, 2003, Agent Pollock learned from his colleague, Agent Cori Start, of Pawoo's and Isabel's residence at 44 West 2700 South, and thereafter observed the house from a pick-up truck parked nearby. Agents Pollock and Start watched the house for several days. During this time, Agent Pollock noticed a detached garage located to the side and rear of the house, and Agent Start also noted two mailboxes on the front of the 44 West 2700 South structure.

Agent Pollock observed that Pawoo and Isabel only entered into and exited from the 44 West 2700 South house. He noted that they drove exclusively either a silver Geo Tracker or a black Oldsmobile Cutlass. According to Agents Pollock and Start, the suspects did not use any of the other cars parked on the property.

B. 44 West 2700 South record search

On January 30, 2003, Agent Pollock telephoned Joe Gomez, a Criminal

Information Specialist for the Utah Bureau of Investigations, and requested that Mr. Gomez "run a search on the property and the residents of the home." Aplts' App. vol. IV, at 1308 (Dist. Ct. Order, dated Nov. 9, 2004) (internal quotation marks omitted). Agent Pollock explained to Mr. Gomez that there was a detached structure on the property. *Id.* vol. II, at 543. Mr. Gomez's search revealed that James Byron Tucker owned the property, and that Mr. Tucker leased the property to tenants. Mr. Gomez's review of the Questar Gas records indicated that the gas account for 44 West 2700 South was listed under the name of Melissa Harman. After obtaining Ms. Harman's social security number, he learned that she had a New Mexico driver's license and credit activity in New Mexico.

The Salt Lake County Recorder's Office listed 44 West 2700 South as a single family dwelling that included a detached structure. The records indicated that the detached structure was built in 1954 and contained a "finished main floor," built in 1963. *Id*. vol. IV, at 1309 (internal quotation marks omitted). Agent Pollock recalls discussing the property description with Mr. Gomez, who informed him that the property "was two plots of land divided roughly in the middle." *Id*. vol. II, at 539. The property description from the county assessor also indicated that the property encompassed "LOTS 44 & 45." *Id.* at 516-17.

Agent Pollock does not recall reviewing the 1987 deed of trust for the property. The deed described the property as follows:

LOTS 44 AND 45, BLOCK 1, SOUTH GATE PARK PLAT "A," ACCORDING TO THE PLAT THEREOF, AS RECORDED IN THE OFFICE OF THE COUNTY RECORD OF SAID COUNTY.

*Id.* at 508.

Agent Pollock recalls discussing with Mr. Gomez the gas bill and the bill payor, Melissa Harman. Mr. Gomez told him "that she's the one that applied with Questar to get the gas hookup to the home." *Id.* at 540. Agent Pollock recalls that either he or Mr. Gomez mentioned seeing a white vehicle with New Mexico license plates in the driveway of 44 West 2700 South. Agent Pollock stated that he did not think Melissa Harman was the woman he had been investigating, but, after seeing the New Mexico plates, he "just assumed that it was [Ms. Harman's] vehicle." *Id.* at 542. Despite these apparent inconsistencies, Agent Pollock did not run a check on these plates, nor did he instruct anyone to run a search on these plates. *Id.* at 527, 542.

Mr. Gomez also reported that two other individuals indicated they resided at 44 West 2700 South, Benjamin Paul and Williams Fawcett. Subsequent investigation revealed that Mr. Paul and Mr. Fawcett each had criminal felony records.

C. The affidavit and search warrant

Given his surveillance and purchases from Pawoo and Isabel, Agent Pollock drafted an affidavit in support of an application for a search warrant. The

affidavit described Isabel as a Hispanic female with red hair and brown eyes, and Pawoo as a Hispanic male with black hair and brown eyes. Agent Pollock conferred with District Attorney Katherine Bernards-Goodman, who reviewed the draft affidavit, and asked her about searching the garage. He stated he was trying to "find out if [he] had legal rights to go through the garage" but "wanted to make sure since [the garage] was on the same property . . . that . . . with [his] training and with [his] past knowing that people store things in the garage, was it acceptable under the same search warrant to go through the garage because it was detached." *Id.* at 547. District Attorney Bernards-Goodman asked if there were any indicia that a second residence was on the property, such as separate address numbers or a separate mailbox. According to the district court, Agent Pollock told her he was "not aware of any indicia of a second residence." *Id.*, vol. II, at 854.

One February 4, 2003 Agent Pollock submitted the proposed search warrant and affidavit to a Utah state court judge. The application described the property to be searched as:

> 44 West 2700 South, South Salt Lake City, Utah, a white house, brown roof, front door faces south, small wood fence to the west of the door across the front, #44 on the wall to the right of the front door, a *detached garage to the rear* of the house on the east side

*Id.* at 485 (emphasis added). The search warrant, issued the same day, described

the property identically to the affidavit. The search warrant authorized the officer to search the property described, "including any and all outbuildings and curtilage of the property." *Id.* at 724. Agent Pollock was aware that the detached garage itself had an addition (the 1963 finished main floor). He stated that he knew that an attachment to the garage existed before the execution of the warrant.

After he obtained the search warrant, Agent Pollock learned of the violent criminal backgrounds of Mr. Paul and Mr. Fawcett, who purportedly lived at 44 West 2700 South. Accordingly, Officer Pollock then contacted the SERT/SWAT officers to arrange for their assistance in the execution of the warrant.

4. The SERT/SWAT team's Operations Order

Three SERT/SWAT officers formed a scout team to investigate and surveil 44 West 2700 South. The scout team members reported they heard voices coming from the detached structure, observed lights on in the structure during the evening, and had seen individuals entering and exiting the garage. They also commented about the number of cars on the property. Scout member Officer Donovan Lucas testified that he told Agent Pollock that "we've seen people going in there, are we sure that this is the primary residence?" to which Agent Pollock responded, "Yes, I've already double-checked that." *Id.* vol. II, at 584.

As the district court noted,

Agent Pollock told Sergeant Barnett that the scout team members

believe[] or [sic] someone may be using the outbuilding. Sergeant Barnett, upon consulting with Lieutenant Lloyd Edward Michaud about the observed use of the outbuilding, told Agent Pollock to contact the district attorney's office for advice. Agent Pollock told Sergeant Barnett he had already consulted a district attorney, who said the outbuilding could be legally searched with the search warrant.

*Id.* vol. IV, at 1312. Sergeant Barnett's declaration indicates that "Agent Pollock advised [him]" that the district attorney's office told him "the outbuildings could be legally searched with the Search Warrant." *Id.* vol. II, at 619. Agent Pollock does not recall using the term "outbuildings," but "probably said garage." *Id.* at 557.

Agent Pollock told the scout team it could do more checking if it remained concerned. The scout team contacted the city and reviewed a plat map, which indicated there was only one address for the property. Agent Pollock stated that Officer Donovan Lucas reported that the city planner indicated "[t]here was no second residence on the home as far as they're concerned." *Id.* at 552. Agent Pollock added that "the owner was going to be contacted hopefully after the search warrant was executed and that they were living [in the detached structure] quote/unquote illegally is what I was told through [Officer Lucas]." *Id.* Officers Tyler Kotter, Aiveni Taufu, and Lucas of the scout team drafted the SERT/SWAT Operation Order that Agent Pollock approved. The order described a "single family *dwelling with detached garage/residence*." *Id.* at 731 (emphasis

added).  In his deposition, Officer Lucas testified the term garage/residence was used because the team members "weren't sure" whether someone was living there. *Id.* at 824.  He acknowledged that "if there's a secondary address on [the warrant], then we really shouldn't execute the continuation of the warrant." *Id.* at 823.

The Operations Order continued as follows:

> Left stick will be the entry stick for *residence #1* and the right stick will be the entry stick for the *residence #2* . . . .  At driveway, left stick will slow to allow right stick to get into the back of the residence to simultaneously enter the two buildings.  Left stick will then proceed to the white [sic] side of *residence #1* and prepare to breach the front door (single door knob right hinged left). . . .  Right stick will then proceed to the white [sic] side of *residence #2* and prepare to breach the front door *residence #2*, . . . .  Two other officers will port [sic] and cover the 2-2 windows on the black [sic] side of *residence #2* once the primary entry of *residence #2* has been breached.  Both sticks will enter their respective buildings and secure and clear the residences.

*Id.* at 734 (emphasis added).  The Operations Order designated the back side of residence #2 a "danger area" because motion lights in the commercial storage bordered the back side of the property.  *Id.*

5. The Execution of the Warrant

On February 12, 2003, at approximately 12:30 a.m., Agent Pollock and Sergeant Barnett met with the SERT/SWAT team at a parking lot close to the house.  The SERT/SWAT team departed to execute the warrant, while Agent Pollock and Sergeant Barnett waited behind for confirmation regarding the

securing of the area.

The SERT/SWAT team divided into two units: the "right stick" for the house and the "left stick" for the garage. At 12:46 a.m., the units simultaneously entered 44 West 2700 South and 44 ½ West 2700 South. To enter the garage apartment, the team broke through a rear window, and also entered through the side door. The team members swarmed the garage apartment with their weapons drawn.

Ms. Harman and Mr. Overton were discovered sleeping, lying unclothed on a mattress. Ms. Harman was wearing only thong underwear; Mr. Overton was naked. The team members smelled burnt marijuana and saw marijuana and a pipe on the kitchen counter. The SERT/SWAT team gave the plaintiffs a single bed sheet, handcuffed them to the couch, and searched the premises. Ms. Harman contends that she was so terrified that she urinated on herself, and was not given the opportunity to clean herself. Plaintiffs contend that only after an hour of being handcuffed in the February cold air did male officers help them dress. The defendants maintain that a female officer assisted Ms. Harman and a male officer aided Mr. Overton.

After securing the property, the SERT/SWAT team radioed Agent Pollock and Sergeant Barnett. Sergeant Barnett testified that "[w]hen [he] walked in the door, [the plaintiffs] were sitting on the couch." *Id*. vol. III, at 1150. He testified

that the residence "appeared it could have been" a "separate residence," noting the counter and small kitchen. *Id.* at 1147. He "wasn't sure" whether the plaintiffs were involved in the drug ring. *Id.* at 1150. Despite his doubts, Sergeant Barnett returned to 44 West 2700 South to assist the processing of the suspects there.

After about thirty minutes, Sergeant Barnett returned to question the plaintiffs individually. The plaintiffs had been moved to a van holding suspects from 44 West 2700 South. Sergeant Barnett spoke to each plaintiff for about fifteen to twenty minutes. Ms. Harman repeatedly requested to see the search warrant. The plaintiffs told Sergeant Barnett that they had moved into the residence a few weeks earlier and were not involved with the drug trafficking at the 44 West 2700 South residence. Sergeant Barnett testified that upon completion of the interviews, he "felt certain" the garage apartment was a separate residence. *Id.* at 1149.

Agent Pollock did not interact with the plaintiffs. To apparently conceal his identity, Agent Pollcok testified that, upon returning to 44 West 2700 South, he donned a Balaclava, a type of head gear that covers the whole head. He then remained in front of the house in the shadows near some bushes and viewed the goings on from there. Agent Pollock did not recognize either Ms. Harman or Mr. Overton, but thought their features may have been consistent with purchasers of

drugs from 44 West 2700 South. The district court concluded that Agent Pollock entered 44 ½ West 2700 South after the plaintiffs' removal. While there, "he conducted a quick search for weapons or drugs." *Id.* at 1321.

Sergeant Barnett then told Lieutenant Michaud, who was in charge, that plaintiffs were not involved in the drug trafficking at 44 West 2700 South. Lieutenant Michaud gave the plaintiffs citations for possession of marijuana and paraphernalia, and they were released at 2:35 a.m.

Ms. Harman and Mr. Overton filed a complaint under 42 U.S.C. § 1983, alleging that Agent Pollock and Sergeant Barnett violated their Fourth Amendment rights (1) to be free of unreasonable searches, and (2) to be free from unreasonable detentions. The district court concluded that the officers were entitled to qualified immunity because (1) the entry into the garage apartment was objectively reasonable, and (2) the subsequent detention was also reasonable. For the reasons given below, we affirm in part and reverse in part.


II. DISCUSSION

Ms. Harman and Mr. Overton allege a deprivation of their Fourth Amendment rights to be free from unreasonable searches and seizures. First, they contend that the officers' entry into their residence violated the Fourth Amendment. Second, they contend that their continued detention was also a

violation of their Fourth Amendment rights. We hold that the initial entry into the home was an objectively reasonable mistake, although the officers learned quickly of the extent of and reasons for the mistaken entry. Thus we affirm the district court's grant of summary judgment on the first contention. As to the continued detention of the plaintiffs, we hold that there exist material factual disputes as to the reasonableness of the defendants' actions, and we reverse the district court's grant of summary judgment to the defendants.

A. Standard of review

> We review a grant of summary judgment on the basis of qualified immunity *de novo.* Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). We construe the record in the light most favorable to the non-moving party.

*Jiron v. City of Lakewood*, 392 F.3d 410, 413-14 (10th Cir. 2004) (citation omitted). There is a genuine issue of material fact if the nonmoving party presents facts such that a reasonable jury could find in favor of the nonmoving party. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). "If there is no genuine issue of material fact in dispute, we determine whether the district court correctly applied the substantive law." *Id.*

In a case such as this one, where a defendant invokes qualified immunity,

the plaintiffs "must show that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred." *Mimics, Inc. v. Village of Angel Fire,* 394 F.3d 836, 841 (10th Cir. 2005) (internal quotation marks omitted). We "must first determine if a constitutional right was violated because '[i]n the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.'" *Id.* at 842 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

"Requiring the law to be clearly established provides defendants with 'fair warning' that their conduct is unconstitutional." *Id.* at 842 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002)). "'The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains.'" *Id.* (quoting *Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003)). To be clearly established,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted).  Thus, qualified immunity leaves "ample room for mistaken judgments," *id.* at 341, and protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The parties do not dispute that "the law in this area was well-established at the time of the search in question." *Peterson v. Jenson,* 371 F.3d 1199, 1203 (10th Cir. 2004) (citing *Maryland v. Garrison,* 480 U.S. 79, 87 (1987); *Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995) ("[A]ny search or seizure that took place after the officers knew or reasonably should have known that they were in the wrong residence would no longer be protected by qualified immunity.").

B. The initial entry into 44 ½ West 2700 South

1. The warrant sufficiently described the areas to be searched.

The Fourth Amendment to the United States Constitution provides in part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  "'The test for determining the adequacy of the description of the location to be searched is whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched.'"  *United States v. Lora-*

*Solano,* 330 F.3d 1288, 1293 (10th Cir. 2003) (quoting *United States v. Pervaz,* 118 F.3d 1, 9 (1st Cir. 1997)).

The plaintiffs first contend that the warrant's factual inaccuracies, resulting in part from Agent Pollock's omissions and unreasonable inferences, rendered the warrant invalid. The warrant described the premises to be searched as follows:

> the premises known as: 44 West 2700 South, South Salt Lake City, Utah, a white house, brown roof, front door faces south, small wood fence to the west of the door across the front, #44 on the wall to the right of the front door, a detached garage to the rear of the house on the east side.

Aplts' App. vol. II, at 723.

Despite plaintiffs' protestations to the contrary, our precedent suggests that the warrant sufficiently described the area to be searched. We have upheld warrants like the one at issue where one part of the description is inaccurate, but the description has other accurate information to identify the place to be searched with particularity. *See Lora-Solano*, 330 F.3d at 1293. "A technically wrong address does not invalidate a warrant if it otherwise describes the premises with sufficient particularity so that the police can ascertain and identify the place to be searched." *Id.*; *cf. United States v. Williamson,* 1 F.3d 1134, 1136 (10th Cir. 1993) (invalidating a warrant that designated a rural mail box nine miles away from the premises that were searched, where the government argued unsuccessfully that the executing officer's knowledge of the actual location of the

-16-

business alone cured the defective warrant).

"With the benefit of hindsight, . . . we now know that the description of that place was broader than appropriate . . . ." *Garrison,* 480 U.S. at 85. In *Garrison*, the officers realized, after their initial entry, that the description in the warrant was overbroad. The warrant encompassed the entire third floor of an apartment building, while the officers assumed there was only one apartment on that floor. In fact there were two apartments. The Court instructed that "we must judge the constitutionality of their conduct in light of the information available to them at the time they acted. Those items of evidence that emerge after the warrant is issued *have no bearing upon whether or not a warrant was validly issued*." *Id.* (emphasis added).

We do acknowledge that the omission of the garage residence's actual address was more than a mere clerical error. "The requisite specificity of the description . . . depends heavily on the facts of each case." *United States v. Dorrough*, 927 F.2d 498, 500 (10th Cir. 1991). Here, although the address given in the warrant was not the address of the garage residence, "the description of the premises to be searched . . . still describe[d] the same piece of property." *United States v. Gitcho*, 601 F.2d 369, 371-72 (9th Cir. 1979) (warrant met particularity requirement even though it misstated address of premises because the address, though technically incorrect, was reasonable for the location intended; the agents

-17-

executing the warrant personally knew which premises were intended to be searched; and the premises which were intended to be searched were those actually searched).

Despite some inconsistencies in the legal title research, the affidavit and warrant provided accurate physical descriptions of the structures to be searched: "a white house, brown roof, front door faces south, small wood fence to the west of the door across the front, #44 on the wall to the right of the front door, a detached garage to the rear of the house on the east side." Aplts' App. vol. II, at 723. As explained more fully below, perhaps there were indications suggesting different residences at 44 and 44 ½ West 2700 South. Despite these inaccuracies, Agent Pollock, through surveillance, had personal knowledge of the physical description of the structures to be searched. *See Gitcho*, 601 F.2d at 372 (upholding search warrant in part where "the agents executing the warrant personally knew which premises were intended to be searched, and those premises were under constant surveillance while the warrant was obtained").

Another factor supporting the warrant's descriptive sufficiency is "that the premises which were intended to be searched had previously been surveilled or were being surveilled while the warrant was obtained." *Id.* For these limited purposes, we hold that the warrant described the premises to be searched with sufficient particularity.

2. The warrant did not omit or misstate material information.

Next, we consider the plaintiffs' suggestion that Agent Pollock intentionally omitted and misstated material information in his affidavit in support of the search warrant. The omission of the garage residence's address from the affidavit supporting the application for the warrant "was clearly not an instance of 'a police officer ma[king] false statements in an affidavit supporting a search warrant knowingly or with reckless disregard for the truth.'" *Lora-Solano,* 330 F.3d at 1295 (quoting *United States v. Tuter*, 240 F.3d 1292, 1299 (10th Cir.2001) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978))).

"The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." *Garrison,* 480 U.S. at 85. Agent Pollock identified the existence of a separate garage. He conferred with the District Attorney's office and relied upon the information supplied by Mr. Gomez, which indicated that the property included a single family home with a detached garage and a "finished main floor." Aplts' App. vol. II, at 563. On the basis of the information presented to Agent Pollock, we agree with the district court that the warrant, insofar as it authorized a search that turned out to be overbroad in scope, was valid when it issued. No evidence supports the plaintiffs' suggestion that Agent Pollock knowingly and intentionally misstated and excluded material

information regarding the detached structure in his affidavit in support of the application for a warrant.

> 3. The officers were reasonably mistaken when they initially entered 44 ½ West 2700 South.

Having held that the warrant's overbroad verbiage did not, standing alone, render the warrant invalid, we consider the much closer legal question of whether the officer's initial entry into the separate residence at 44 ½ West 2700 South was reasonable. Plaintiffs contend that the agents' actions were unreasonable given the information known to them. The district court concluded that the "Defendants' mistake was objectively reasonable." *Id.* vol. IV, at 1320. "Agent Pollock reasonably relied on the investigation of Mr. Gomez. His reliance was strengthened by the information given him by the members of the scout team." *Id.*

In so finding, the district court summarized the factors it considered in support of the plaintiffs and the defendants. As to the entry into 44 ½ West 2700 South, the district court found the following evidence supported the plaintiffs:

> 1. The main residence had two mailboxes on the front.
> 2. Agent Pollock never saw suspects go in or out of the garage apartment.
> 3. The Salt Lake County records indicated that in addition to the single family residence, there was a outbuilding consisting of a garage and a finished main floor.
> 4. A deed of trust showed two addresses given for the property: 44 West 2700 South and 44 ½ West 2700 South.
> 5. 44 ½ West 2700 had a Questar Gas account.

6. The United States Postal Service had the 44 ½ West 2700 South address listed in its database.

7. The phone company sent bills to the 44 ½ West 2700 South address.

8. The plat indicated two lots.

9. The plaintiffs' vehicles parked on the property were not those seen being used by Pawoo and Isabel.

10. The outbuilding had pipes from the roof, a door and a window that looked "residential," and a light and mailbox situated near the door.

11. Members of the scout team told Agent Pollock that they were concerned that the officers knew the outbuilding might be used as a residence, or as something other than a garage, because there were reports of lights and voices and people coming and going.

12. The Operations Order listed the residence as "Single Family Dwelling with detached Garage/Residence" and often referred to "residence #1" and "residence #2."

Aplts' App. vol. IV, at 1317-18.

As to factors supporting the defendants, the district court listed:

1. Agent Pollock thought one of the two mailboxes on the front of 44 West 2700 South was for a newspaper.

2. No evidence shows that any of the officers noticed the pipes coming out of the back of the roof, or thought the door and window on 44 ½ West 2700 South were signs of a residence.

3. Mr. Gomez's investigation did not reveal the 44 ½ West address; he checked the Salt Lake County Recorder's Officer's records, which showed that 44 West 2700 South as a single family dwelling with one detached structure: a garage with a finished main floor.

4. Because Mr. Gomez did not know about the 44 ½ West address, he did not check the Questar records for that address.

5. Mr. Gomez believed, after his review of all the records, that there was nothing to indicate that the outbuilding was being used as a residence. Mr. Gomez testified: "My research, there's no indication other than one single family dwelling."

6. Mr. Gomez told Agent Pollock: "The information that I would have relayed to him (Agent Pollock) is the owner of the property and that it shows a single family dwelling . . . . I identified to him single family dwelling."

7. After Agent Pollock encouraged members of the scout team to do

their own investigation to verify whether there was a second residence, they "went to the South Salt Lake City planner and reviewed the city plan, a map of the area, and received information on the address. All of [their] research indicated this was a single occupied residence with one address. The garage was not a separate residence, but a part of the property at 44 West 2700 South."

8. Agent Pollock testified:" "I didn't have any suspicions that there was a secondary residence there ever except for the fact that my scout Donavan Lucas advised me that they had gone to the planner's office to see if possible there was a secondary residence on the home. And when I asked him, he said no, and that confirmed the information that Joe Gomez gave me that there was not a secondary residence on the property."

*Id.* at 1318-19 (citations omitted).

The plaintiffs insist that, based on the above, "[n]o reasonable officer could possibly believe [their] home was merely a garage." Aplts' Br. at 47. In addition to the evidence and testimony weighing in their favor as noted by the district court, they emphasize that the following factors clearly indicate to a reasonably competent officer that the detached structure was a residence:

- the simultaneous raids of "residence #1" and "residence #2,"
- the *three* separate mailboxes (two on 44 West 2700 South and one on 44 ½ West 2700 South),
- the deed of trust,
- the U.S. Postal Service records,
- the gas bill for 44 West 2700 South in Ms. Harman's name,
- the scout team's inspection of the front door hinges, and presumably, the residential type front door and the porch, porch light, rug etc. on 44 ½ West 2700 South,
- the residential windows on 44 ½ West 2700 South,
- the New Mexico license plates on Ms. Harman's car,
- the cement walkway and landscaping, and
- separate telephone service.

-22-

The defendants counter that, even had they been able to observe the purported porch, porch lights, cement pad, and steps, their existence would have been inconsequential. Such features are commonly found on garages and similar outbuilding that are not used as dwellings.

As to SWAT team member Officer Aiveni Taufa's examination of the garage door's hinges, the defendants maintain that the team was merely determining which way the side door opened, so as to execute the warrant as safely and effectively as possible. Officer Taufa testified he saw the door and the purported porch light, but did not recall seeing the mailbox or the rug. The defendants maintain that Officer Taufa's failure to notice these items does not render the initial entry unreasonable. Similarly, the defendants argue that the number of vehicles on the property was consistent with the suspects' known use of the property: numerous different vehicles frequently came and went from drug houses.

Particularly at summary judgment, this matter is close, but after considering all of the above factors, and the arguments supporting and against each of them, we agree with the district court that Sergeant Barnett and Agent Pollock reasonably relied upon the information supplied by Mr. Gomez. Although there was a possibility of a separate residence, the information supplied by Mr. Gomez and the scout team's independent verification that the property contained only one

residence confirmed Agent Pollock's information supplied in his affidavit.

We therefore reject the plaintiffs' suggestion that Sergeant Barnett and Agent Pollock acted unreasonably based on the information before them. The *Garrison* court ultimately decided that "the officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." 480 U.S. at 88-89. In *Garrison*, "the objective facts available to the officers at the time suggested no distinction between [the] apartment and the third-floor premises." *Id.* at 88. The same reasoning applies here to 44 West 2700 South and 44 ½ West 2700 South. Accordingly, after a thorough review of the record, we agree with the district court that upon the initial entry into 44 ½ West 2700 South, the SERT/SWAT team had reason to believe that the separate detached garage was not a separate residence. Given the facial validity of the warrant, the officers permissibly entered the separate residence.

C. Material factual disputes exist as to the reasonableness of the subsequent search and detention of Ms. Harman and Mr. Overton.

Having determined that the initial entry into 44 ½ West 2700 South was reasonable, we must consider whether the defendants, upon realizing the mistaken execution of the warrant, acted reasonably in their subsequent execution of the search warrant and detention of the plaintiffs, which is required for the grant of summary judgment on qualified immunity grounds. The district court found that

-24-

"[a]lthough Plaintiffs told [Sergeant] Barnett that theirs was a separate residence and they had no connection with the 44 West address, [he] acted reasonably in investigating further before he accepted their story." Aplts' App. vol. IV, at 1322. Relying on *Peterson v. Jenson,* 371 F.3d 1199, 1203 (10th Cir. 2004), the district court determined that Sergeant "Barnett released the Plaintiffs after he had spoken to the occupants of [44] West 2700 and confirmed that the Plaintiffs had no connection to them." Aplts' App. vol. IV, at 1323.

Ms. Harman and Mr. Overton contend that the officers did not terminate the search and detention upon realizing that the SERT/SWAT had raided a separate residence with occupants unrelated to the suspects in the main house. Thus, the search and detention exceeded the scope of the warrant. According to the plaintiffs, the immediate discovery of a separate residence and occupants bearing no resemblance to any of the suspects would have informed any reasonable officer of the mistake.[1]

---

[1] In their Reply Brief, plaintiffs also suggest that the detention and search were carried out unreasonably, citing the degrading nature of the detention: plaintiffs "were removed from their bed without any clothing," Ms. Harman "was wearing thong underwear only," "forcing [the plaintiffs] into their living room to remain sitting handcuffed on their couch . . . is shocking," "[t]he February air was freezing," Ms. Harman "was never given the opportunity to remove her soiled underwear or clean herself," resulting in "unnecessar[y] degrad[ation]" inside and outside their home. Reply Br. at 26-28.

To the extent these facts were raised before the district court and in plaintiffs' opening brief as part of the alleged unreasonableness of the continued detention and search of 44 ½ West 2700 South, and to the extent they are relevant to that inquiry, we

The officers argue that: (1) relying on *Garrison* and *Peterson*, Sergeant Barnett could not have realized the warrant was overbroad until he interviewed the occupants of the 44 West 2700 South, and Ms. Harman and Mr. Overton; (2) they had authority to detain the plaintiffs merely because they were occupants on the premises; (3) the discovery of contraband provided independent probable cause to detain the plaintiffs; and (4) the officers had probable cause to detain, arrest, and incarcerate the plaintiffs. Because the district court granted summary judgment on the first argument, it did not consider whether the evidence was uncontroverted as to the remaining arguments.

1. Realization that the warrant was overbroad.

The officers maintain that the district court's application of *Peterson* was correct and that they acted reasonably in holding the plaintiffs and searching the garage apartment. As noted above, the Supreme Court in *Garrison* held that police officers do not necessarily violate the Fourth Amendment when they mistakenly execute a search warrant on the wrong address. "[T]he [Supreme]

shall consider them. We shall not consider a separate claim that the manner in which the search and detention were carried out was unnecessarily degrading, as that claim was not raised in the opening brief, however. *See Anderson v. U.S. Dep't of Labor,* 422 F.3d 1155, 1174 (10th Cir. 2005) (holding that "[t]he failure to raise an issue in an opening brief waives that issue."). "Consistent with these principles is the general rule that 'appellate courts will not entertain issues raised for the first time on appeal in an appellant's reply brief.'" *Id.* (quoting *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277-78 (10th Cir. 1994)).

Court has . . . recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." 480 U.S. at 87. In this vein, the Court noted that, the officers "were required to discontinue the search of respondent's apartment *as soon as they* . . . were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." *See id.* (emphasis added). "[T]he validity of the search of [the plaintiff's] apartment . . . depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 88.

*Garrison* requires that the officers were obligated to retreat as soon as they knew or reasonably should have known that there was a mistake, i.e., they were in the wrong residence. *See id.* at 87-88. The Court emphasized that the officers "were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore *were put on notice* of the risk that they might be in a unit erroneously included within the terms of the warrant." *Id.* (emphasis added).

In *Peterson*, relied upon by the district court, the panel affirmed the district court's denial of the defendant-officers' motion to dismiss. There, the officers entered a residence in search of two suspects. The suspects no longer occupied the residence. The residents of the apartment alleged that they were

searched and interrogated even after they identified themselves. 371 F.3d at 1202-03.

The panel held that, given the procedural posture of the case, where it must take all well-plead allegations as true, the plaintiffs alleged a constitutional violation. The panel noted, however, that, "the search became unconstitutional only if it continued after the defendants realized, or reasonably should have realized, that the people named in the warrant as occupants of the apartment no longer resided there." *Id*. at 1203 (citing *Garrison* 489 U.S. at 88). We agree with the district court that *Peterson*'s instructions in this regard are helpful, but we diverge because material facts still in dispute here preclude summary judgment.

The Sixth Circuit's ruling in *Pray v. City of Sandusky*, 49 F.3d 1154 (6th Cir. 1995) is particularly instructive to show why material facts are still in dispute. In *Pray*, an elderly married couple brought a civil rights suit under § 1983 against various police officers and a municipality alleging an illegal search and seizure and excessive force in violation of the Fourth Amendment. There, the police gathered information for a warrant to search the upper apartment of a duplex, and arrived at the residence to execute that warrant. This was the second search warrant for this upper apartment. A first warrant for the upstairs apartment had been executed six weeks earlier. At least one of the officers

present at the first raid was also present at the second raid.  *Id.* at 1156.

The Prays' home was on the lower level of the duplex containing a common vestibule with one door opening immediately to a flight of ascending stairs where the upper apartment was accessed, and one door opening directly into the lower apartment where the Prays lived.  "Neither door in the vestibule was identified by number or name."  *Id.*  The officers held a "pre-raid" briefing to review the layout of the building and plan the execution of the second warrant.  The officer or officers present at the previous raid knew that the correct apartment would be accessed after climbing a flight of stairs.

In executing the warrant, the officers' team knocked on "what it considered the 'obvious' door" and, after receiving no immediate response, forced the door open; the door turned out to be the door leading to the Prays' apartment.  *Id*. at 1157.  The officers then swarmed through the apartment; they confronted Mr. Pray at gunpoint, and pushed him to the floor; another officer discovered Mrs. Pray and pushed her to the ground; the officers remained for about five minutes securing and searching the residence.  After finding nothing, the officers proceeded to the upstairs apartment which was the correct object of the search warrant.  *Id.* at 1157.

As to the detention, the Sixth Circuit rejected the defendants' qualified immunity defense, noting the plaintiffs' testimony that "despite knowing that they

were in the wrong place, the defendants nevertheless 'secured' the Pray residence for an additional four to five minutes." *Id.* at 1160.  Given this testimony, the court held that it was "for the trier of fact to determine, based on the credibility of the evidence before it, at what point the officers knew or reasonably should have known they were at the wrong residence, and to determine what searches and seizures occurred after that." *Id.*; *see also Liston v. County of Riverside*, 120 F.3d 965, 977 (9th Cir. 1997) (finding "'triable issues' regarding the reasonableness of the detention, particularly as to whether it continued after the officers knew or a reasonable officer would have known that a serious mistake had been made").

The Fifth Circuit reached a similar conclusion in *Simmons v. City of Paris,* 378 F.3d 476, 481 (5th Cir. 2004).  In *Simmons*, the police officers executed a valid search warrant upon the wrong address: the search warrant was for 400 N.W. 14th Street, and plaintiffs were residents of 410 N.W. 14th Street.

> When the entry team members assembled into a single file line, two of the plaintiffs, Charlotte and Dustin Handley, were on their front porch. Seeing Ms. Handley and her son on the front porch, Officer McFadden sprinted toward them, and the rest of the entry team followed. Charlotte and Dustin, not realizing who the officers were, quickly retreated back inside their home. Officer McFadden followed Ms. Handley into her house through the still open front door. He immediately detained Ms. Handley and Mr. Simmons in the front room. The other members of the entry team followed Officer McFadden into the house and detained the children, Dustin and Angelica, either in Angelica's bedroom or the kitchen.

> The officers quickly realized they were in the wrong home. In fact, at least two of the officers behind Officer McFadden knew that they were

approaching the wrong house, but they thought perhaps Officer McFadden had seen the suspected drug dealer run into the Handley home and that he was in pursuit. The district court found that there *were factual disputes as to how long the officers remained in the Handleys' house and whether the officers continued searching the residence after they knew it was the wrong house.*

*Id.* at 478 (emphasis added). The Fifth Circuit affirmed the district court's denial of summary judgment for those defendants who entered the home. *Id.* at 481-82.

Qualified immunity does not provide a safe harbor for police to remain in a residence after they are aware that they have entered the wrong residence by mistake. A decision by law enforcement officers to remain in a residence after they realize they are in the wrong house crosses the line between a reasonable mistake and affirmative misconduct that traditionally sets the bo

*Id.* at 481.

Here, the record indicates that the defendants knew early on, that is, before the SERT/SWAT team entry, there was a *possibility* that the garage was a separate residence. Agent Pollock met with the district attorney who raised the presence of possible indicia on the garage of a separate residence, such as a separate address or a separate mailbox. He stated that he knew there was "something" attached to the house – but that he did not know if it was original. He "thought maybe it was possibly a little workshop." Aplts' App. vol. II, at 556. Agent Pollock acknowledged that he saw the plaintiffs, and that they did not resemble the suspects, who were of Hispanic descent.

Sergeant Barnett acknowledged he was aware of a "possibility" of a second residence before the execution of the search. *Id.* vol. III, at 1149. According to

-31-

Sergeant Barnett, this possibility became a strong suspicion when he entered the garage, and was confirmed after interviewing the plaintiffs and those suspects detained in 44 West 2700 South. *Id.* From the time he entered the garage, he did not suspect the plaintiffs "to be part of the known characters in the investigation." *Id.* vol. II, at 604. Rather than allay his suspicion, Sergeant Barnett opted to focus on the suspects at 44 West 2700 South.

Each of the officers had ample notice that the garage may have been a separate residence. *See Garrison*, 388 U.S. at 87. Neither plaintiff resembled any target described in the warrant or the underlying affidavit. Therefore, we conclude that there are material facts in dispute as to the reasonableness of the officers' delay in realizing that they were at a separate residence not anticipated in the warrant. In addition, factual disputes exist as to whether the full scale search took place after the officers should have realized they were in the wrong residence.

2. Limited authority to detain the plaintiffs

Next, the officers argue that, under *Michigan v. Summers*, 452 U.S. 692, 705 (1981), and *Muehler v. Mena*, 125 S. Ct. 1465 (2005), they justifiably detained the plaintiffs. *Summers* states that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a *proper* search is conducted." 452 U.S. at

705 (emphasis added). According to the officers, they "could potentially hold Plaintiffs in handcuffs for two to three hours without violating the fourth amendment." Aples' Br. at 43.

In *Summers*, the officers were about to execute a search warrant upon the suspect's home. The suspect was descending the front steps at the time. After he assisted the officers in gaining entry, the officers detained him while they conducted the search. The court concluded that the detention of the suspect was reasonable: "If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home." *Summers*, 452 U.S. at 704-05. Unlike *Summers*, where "it was lawful to require [the defendant] to re-enter and to remain in the house until evidence establishing probable cause to arrest [the defendant] was found," here, the officers detained the plaintiffs during the execution of what had become a questionably valid warrant. *Id.* at 705. Also, unlike in *Summers*, here, the officers removed the plaintiffs, who were unclothed or barely clothed, from their bed, and forced them to sit handcuffed on the couch during the execution of the overbroad warrant.

In *Muehler*, during a SWAT team raid of 1363 Patricia Avenue, officers handcuffed and detained Ms. Mena, who was found asleep in her bed at that

location. The Court held Ms. "Mena's detention for the duration of the search was reasonable under *Summers* because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search." *Muehler*, 125 S. Ct. at 1470.

Neither *Summers* nor *Muehler* is applicable to this case. First, in neither Supreme Court case was the validity of the underlying warrant at issue. Here, the officers concede the warrant was overbroad. Second, the officers concede that, "[a]s with any authority bestowed by a search warrant, be it categorical or otherwise, that authority terminates when an officers knows or reasonably should know that the warrant is overbroad." Aple's Br. at 43. As established above, we have determined that there are material facts in dispute as to the reasonableness of the lengthy detention of the plaintiffs and when the officers' authority terminated. Accordingly, we reject the officers' argument that under *Summers* and *Muehler*, the detention was unquestionably justifiable.

3. Presence of contraband

Finally, Sergeant Barnett and Agent Pollock argue that the detention was reasonable because once the officers observed contraband in plain view, they had a lawful right to seize the marijuana without a warrant. They contend that they had probable cause to believe that "Plaintiffs were involved in illegal drugs related to the criminal activity for which the warrant had been issued." Aples' Br.

at 45. In addition, the plaintiffs admitted the marijuana and pipe belonged to them.

The officers have not argued that the plaintiffs' continued detention was supported by independent reasons developed during the initial stages of the detention, *e.g.*, to investigate marijuana possession unrelated to the raid on the main dwelling. They argue that the presence of marijuana suggested the plaintiffs were connected "to the criminal activity for which the warrant had been issued." *Id.* at 45.

The officers acknowledge that the small amount of contraband standing alone was insufficient to suggest drug trafficking, and that marijuana was not a drug specified in the affidavit supporting the warrant, which specified cocaine and heroin. Sergeant Barnett agreed that from the time he entered the garage, he did not suspect the plaintiffs "to be part of the known characters in the investigation." Aplts' App. vol. II, at 604. There is nothing in the record to suggest that the questioning of the plaintiffs or other suspects somehow related to the discovered marijuana. Further, the officers merely issued a citation at the end of the encounter, which suggests that ususal police procedures would not have encompassed the handcuffing and detention of the plaintiffs. Notwithstanding these admissions, the officers contend that the contraband provided independent probable cause of related drug activity, which justified the full scale search and

detention of the plaintiffs.

"The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas,* 463 U.S. 765, 771 (1983). "It is true that the 'plain view' doctrine introduces some play into the joints." *Hessel v. O'Hearn,* 977 F.2d 299, 302 (7th Cir. 1992). "Of course, if the police officers' presence in the home itself entailed a violation of the Fourth Amendment, no amount of probable cause to believe that an item in plain view constitutes incriminating evidence will justify its seizure." *Soldal v. Cook County, Ill.,* 506 U.S. 56, 66 n.10 (1992).

As the Supreme Court explained:

> What the 'plain view' cases have in common is that the police officer in *each of them had a prior justification for an intrusion* in the course of which he came inadvertently across a piece of evidence incriminating the accused**.** *The doctrine serves to supplement the prior justification*-whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused-and permits the warrantless seizure.

*Horton v. California*, 496 U.S. 128, 135-36 (1990) (emphasis added) (quotation marks omitted).

We recognize that "[i]t is only after the police begin to execute the warrant and set foot upon the described premises that they will discover the factual

mistake and must reasonably limit their search accordingly." *Garrison*, 480 U.S. at 89 n.14. Although the officers were acting under the auspices of what they believed to be a valid warrant, we have determined that material facts remain in dispute as to the reasonableness of the detention of the plaintiffs and search of the garage apartment. The Supreme Court consistently reminds us that "[a] generalized interest in expedient law enforcement cannot, without more, justify a warrantless search." *Georgia v. Randolph,* No. 04-1067, 2006 WL 707380, at *8, n.5 (March 22, 2006); *see Coolidge v. New Hampshire*, 403 U.S. 443, 481 (1971) ("The warrant requirement . . . is not an inconvenience to be somehow 'weighed' against the claims of police efficiency").

As noted above, the plaintiffs did not resemble the suspects as described in the warrant. The plaintiffs consistently denied any involvement with the residents of 44 West 2700 South. Despite building possibilities of a problem, the plaintiffs were placed in a van with suspects from 44 West 2700 South and questioned about their involvement with those suspects. Sergeant Barnett interviewed Ms. Harman, Mr. Overton, and the suspects from 44 West 2700 South before releasing the plaintiffs.

While we acknowledge that some portion of the detention may have been justified based on the presence of a small amount of marijuana, the district court did not reach this argument, and thus we have no factual findings or credibility

determinations on this matter from the district court. In addition, the parties do not address the sizeable difference between seizing a person or property in an open area, and the seizing of property or persons "situated on private premises to which access is not otherwise available for the seizing officer." *Payton v. New York,* 445 U.S. 573, 587 (1980). The officers at no time considered obtaining a separate warrant. *Randolph*, 2006 WL 707380, at *9 (underscoring "general partiality toward police action taken under a warrant [as against] searches and seizures without one") (internal quotation marks omitted). Nor does the record at this point disclose any reason such as officer safety or the well being of the plaintiffs during the course of the raid that would support further detention until the entire premises were secured. We are also mindful that the governmental interest implicated by the particular criminal prohibition at issue in this case appears to be relatively minor, as the officers issued a citation for a misdemeanor. Moreover, the officers point to nothing in the record to justify the officers' full-scale search of plaintiffs' garage apartment.

Accordingly, we hold that, based on the record before us, material facts are also in dispute as to the reasonableness of the lengthy detention and the full-scale search of the garage apartment. *Cf. Pray*, 49 F.3d at 1160 (determining trier of fact must determine reasonableness of officers' action when they secured residence "for an additional four to five minutes"). The district court may make further

findings on this claim. Should the trier of fact decide that the detention was unlawful, it may be necessary for a jury to determine what portion of the plaintiffs' injuries was proximately caused by the unlawful detention and the lawful citation. *See e.g. Bodine v. Warwick*, 72 F.3d 393, 400-01 (3d. Cir. 1995) (noting that if jury decides troopers' actions were unlawful, "it will be necessary to determine how much of the injury suffered by [plaintiff] was 'proximately' or 'legally' caused by the illegal entry").

We reiterate that "the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (acknowledging the right of police to respond to emergency situations "threatening life or limb" and indicating that police may conduct a warrantless search provided that the search is " 'strictly circumscribed by the exigencies which justify its initiation'") (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)); *see also Wilson v. Layne*, 526 U.S. 603, 610 (1999) ("The Fourth Amendment embodies this centuries-old principle of respect for the privacy of the home."); *Payton,* 445 U.S. at 601 (emphasizing "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic"). Based on the record before us, we must reject the officers' claim the detention of the plaintiffs for at least ninety minutes and the search of the garage apartment were reasonable.

### 4. Probable cause to detain and arrest

Finally, the officers maintain they had probable cause to detain and arrest the plaintiffs, relying on *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (stating that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender"). To the extent the officers' brief raise arguments not raised in the trial court, we do not consider them. *See Young v. United States*, 394 F.3d 858, 861 n.2 (10th Cir. 2005) ("[The] general rule [is] that a federal appellate court does not consider an issue not passed upon below.") (quotation marks omitted). This argument was not raised before or ruled upon by the trial court, and we decline to address it here. We do note however, that, similar to the restrictions placed upon the officers' plain view argument when that view is within a person's home, such admonitions have "equal force when the seizure of a person is involved." *Payton*, 445 U.S. at 587. "A greater burden is placed . . . on officials who enter a home or dwelling without consent. Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." *Id.* (internal quotation marks omitted).

## III. CONCLUSION

In the instant case, taking the plaintiffs' sworn allegations of fact and all reasonable inferences therefrom as true, as we must do in reviewing the denial of a

-40-

summary judgment motion, the plaintiffs have sufficiently alleged violations of the Fourth Amendment right to be free from unreasonable searches and seizures.

We further conclude that there are material factual disputes about whether Agent Pollock and Sergeant Barnett acted reasonably in the continued search of the residence and detention of the plaintiffs. Accordingly, we hold that "[i]t is for the trier of fact to determine, based on the credibility of the evidence before it, at what point the officers knew or reasonably should have known they were at the wrong residence, and to determine what searches and seizures occurred after that." *Pray*, 49 F.3d at 1160. The district court may make findings and hold additional hearings regarding officers' alternative arguments concerning the officers' authority to detain the plaintiffs, and the applicability of the plain view doctrine.

Accordingly, we AFFIRM the district court's grant of qualified immunity to defendants as to the plaintiffs' claim of an unreasonable entry into 44 ½ West 2700 South. Because we conclude that there are material factual disputes about when the officers should have realized they were at a separate residence not encompassed by the warrant, we REVERSE and REMAND the district court's grant of qualified immunity to the officers with respect to the plaintiffs' claims of an unlawful search and seizure.