[No. D050447. Fourth Dist., Div. One. Oct. 12, 2007.]

JOHN N. WOOD, Plaintiff and Respondent, v.
ROBERT EMMERSON et al., Defendants and Appellants.

1508

COUNSEL

Middlebrook, Kaiser, Popka & Hengesbach and Dennis G. Popka for Defendants and Appellants.

David A. Kay and Donald Bradley Cripe for Plaintiff and Respondent.

OPINION

**BENKE, Acting P. J.**—In June 1999 defendant and appellant Robert Emmerson, a San Bernardino County sheriff's deputy, served a search warrant on the home of plaintiff and respondent John N. Wood. Emmerson then arrested Wood for stalking in violation of Penal Code[1] section 646.9 and other related offenses. The district attorney refused to prosecute.

In November 1999 Wood sued Emmerson and defendant and appellant San Bernardino County (collectively defendants), stating civil rights actions under 42 United States Code section 1983 and Civil Code section 52.1. The trial court concluded that as a matter of law the search warrant was facially invalid, Emmerson had no qualified immunity and there was no lawful basis for Wood's arrest or subsequent detention. In May 2005 a jury awarded Wood $1,045 in special damages and $900,000 in general damages. The trial court later awarded Wood $545,973.50 in attorney fees and costs of $7,105.37.

Defendants appeal, arguing they were denied due process because they were prevented from calling witnesses concerning the legality of the search warrant and Wood's arrest, the trial court erred in finding Emmerson lacked probable cause to arrest Wood and search his home, and in the alternative it erred in finding Emmerson was not immune from suit. Defendants finally argue there was insufficient evidence to support the jury's award of damages.

BACKGROUND

A. *Complaint*

The original complaint in this matter was filed in November 1999. By a fourth amended complaint Wood stated causes of actions for the violation of his state and federal civil rights pursuant to 42 United States Code section 1983 and Civil Code section 52.1.[2]

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] Wood's complaint also alleged various other related causes of action, e.g., false arrest, but they were are dismissed by Wood before trial.

The complaint alleged that on June 21, 1999, Emmerson, pursuant to a warrant, searched Wood's home. The basis for the warrant was an allegation by Wood's neighbors Walter and Martha Kadyk, friends of Emmerson, that Wood was stalking and harassing them. At the conclusion of the search, Emmerson made a warrantless arrest of Wood and took him to jail. A judge reviewed and found sufficient Emmerson's declaration in support of probable cause to arrest. Wood was held in custody for 60 hours. He was released after the district attorney rejected prosecution. The district attorney's rejection of the case came less than 24 hours after his arrest. No charges were ever brought against Wood.

The complaint stated a civil rights action under 42 United States Code section 1983 and Civil Code section 52.1. Wood alleged the affidavit prepared by Emmerson in support of his request for a warrant to search Wood's home was intentionally false and/or intentionally omitted facts that would have caused the magistrate serious doubt concerning whether probable cause existed. Wood additionally argued there was no probable cause for his arrest and that he was incarcerated for an unreasonable period after Emmerson was aware the district attorney had rejected prosecution.

B. *Trial Court's Determination of Constitutional Violations*

On July 2, 2001, defendants moved for summary judgment on the basis there was probable cause for the issuance of the warrant and for Wood's arrest. Defendants argued that in any case they were immune from suit under Government Code sections 820.2 and 820.4 as well as having qualified immunity with regard to Wood's federal civil rights action. Defendants' motion for summary judgment was denied.

On September 12, 2002, defendants, by in limine motion, asked that testimony regarding the validity of the search warrant or concerning the validity of Wood's arrest be excluded. They argued Emmerson's affidavit in support of the warrant provided sufficient probable cause for the issuance of the warrant, a magistrate (Judge Cole) had so found, and there was no factual issue regarding the sufficiency of the warrant.

The parties briefed and rebriefed issues related to the validity of the search warrant, Wood's arrest, the manner in which and by whom those issues were to be resolved and the effect of prior judicial determinations that Emmerson's affidavit provided probable cause for the search and that the arrest of Wood was lawful.

On November 18, 2002, a hearing was held on the issues, at which no evidence was taken except apparently the documents attached to the various

pleadings. The trial court concluded it was not bound by the finding of probable cause made by the issuing magistrate. The court then found the affidavit did not provide probable cause for the issuance of the warrant and that the warrant, therefore, was facially invalid. The court made the additional finding Wood had offered sufficient reason to believe Emmerson made material misstatements and omissions in his affidavit and Wood was entitled to a hearing at which he could so prove. The court noted even if the warrant was invalid the officer was entitled to rely on it and was immune from suit unless factors indicated the officer did not act in good faith. The trial court found Emmerson did not act in good faith.

The trial court noted the issue remained whether Emmerson's warrantless arrest of Wood was lawful. The court requested and the parties filed supplemental briefs on the issue.

On December 23, 2002, a hearing, at which no additional evidence was taken, was held on three issues: Was Wood's arrest lawful; was his detention after his arrest lawful once a magistrate determined there was probable cause for his arrest; and were defendants entitled to an evidentiary hearing? The trial court concluded based on the information known to Emmerson before he served the warrant there was no probable cause for Wood's arrest. The court further held nothing found in Wood's house during the warrant search provided probable cause for his arrest. The court also concluded the magistrate's (Judge Van Stockum) finding there was probable cause to detain Wood was in error and was based on misleading statements in Emmerson's declarations. The trial court stated an evidentiary hearing would be held concerning what Emmerson knew at the time he arrested Wood.

On April 24, 2003, the trial court denied defendants' request to call Judges Cole and Van Stockum to testify concerning why they found probable cause to issue the search warrant and to arrest Wood.

On November 19, 2003, defendants asked the trial court to take judicial notice of the prior rulings made by Judges Cole and Van Stockum concerning probable cause to search Wood's house and to arrest him. Defendants requested the jury be instructed concerning the meaning and effect of those rulings.

On January 28, 2004, the trial court denied defendants' motion to take judicial notice of the rulings of Judges Cole and Van Stockum concerning probable cause. The court also refused a jury instruction requested by defendants that the jury was required to accept as valid prior judicial determinations there was probable cause to search Wood's house, items taken from his house were appropriately seized and there was probable cause to arrest Wood and retain him in custody.

On April 30, 2004, defendants argued they were entitled to qualified immunity based on Emmerson's reasonable belief that his actions with regard to Wood were lawful. They also asked the trial court to require the jury make special findings on a host of factual issues related to the legality of the search of Wood's home and his arrest and detention.

On July 28, 2004, the trial court found defendants were not entitled to qualified immunity. The court also ruled the jury would be instructed that the search warrant was invalid and Wood's arrest and detention after arrest were unlawful.

On January 14, 2005, Wood moved for the summary adjudication of issues. He asked that the trial court make findings on a number of issues, including the search warrant was facially invalid, his arrest was unlawful, defendants were not entitled to qualified immunity, and defendants violated Wood's civil rights under 42 United States Code section 1983 and Civil Code section 52.1.

On February 17, 2005, the trial court denied the motion for summary adjudication but confirmed its prior ruling that the search warrant was facially invalid and that the arrest and detention of Wood were unlawful.

A hearing was held on March 28, 2005, to clarify the issues remaining for trial. The court stated the only liability issues remaining were whether Detective Emmerson was acting under color of law, whether his conduct was pursuant to the policy, custom and practice of the County of San Bernardino and whether or not the constitutional rights of Wood were violated within the meaning of Civil Code section 52.1. The court stated no issue remained to be tried concerning qualified immunity.

On April 19, 2005, the trial court concluded defendants were entitled to an evidentiary hearing before the court to determine if Emmerson had probable cause to arrest Wood. The court noted the arrest was made in Wood's home without a valid arrest or search warrant. The court stated such an arrest is unreasonable as a matter of law unless justified by exigent circumstances. The court concluded a hearing would be held to determine whether there was probable cause for the arrest and whether exigent circumstances justified it.

After the hearing, the trial court found Wood was placed under arrest by Emmerson immediately after the officer entered Wood's home. The court ruled, therefore, that any evidence discovered as a result of the search, even if relevant in light of the finding the warrant was invalid, was irrelevant to the legality of the arrest. The court further found there were no exigent circumstances justifying an arrest of Wood in his home.

## C. *Trial*

It was agreed that, in light of the trial court's rulings on issues related to the legality of the search warrant and Wood's arrest and detention, the only issue left for trial was damages.

The trial court instructed the jury the search warrant that purportedly authorized the search of Wood's home was facially invalid, the search conducted of Wood's house was unlawful, the seizure of property from his house was unlawful, Wood's arrest was without probable cause and unlawful, Wood's incarceration on June 21, 1999, was unlawful and Wood's detention on June 21, 1999, through June 23, 1999, was unlawful and the show of authority in executing an invalid search warrant was as a matter of law an improperly applied form of intimidation or coercion.

The court instructed the jury that as a matter of law Detective Emmerson violated Wood's state and federal constitutional rights and violated provisions of 42 United States Code section 1983 and Civil Code section 52.1.

The jury returned a verdict finding defendants liable for $901,045 general and special damages. The trial court entered a judgment for attorney fees of $545,973.50 and costs of $7,105.37.

## DISCUSSION

Defendants note the trial court, without submitting the issue to the jury, found as a matter of law they were liable under 42 United States Code section 1983 and Civil Code section 52.1 for Detective Emmerson's unlawful search of Wood's home and for illegally arresting and detaining him. Defendants complain the trial court usurped the jury's factfinding function in deciding those issues, denied defendants the right to present relevant evidence, failed to give res judicata effect to controlling prior judicial rulings, improperly concluded probable cause did not support the issuance of the search warrant and arrest, and improperly concluded Emmerson was not immune from suit.

█ Civil rights actions generally revolve around two related issues. Was there a violation of civil rights and if so does the offending official nonetheless, under the circumstances of the case, enjoy qualified immunity from suit and liability? In search and arrest situations the question of whether a plaintiff's civil rights have been violated is relatively straightforward and is resolved using the law applicable in criminal cases to motions to exclude evidence based on claimed Fourth Amendment violations. (See generally, *Malley v. Briggs* (1986) 475 U.S. 335, 343–346 [89 L.Ed.2d 271, 106 S.Ct. 1092].)

■ The law of qualified immunity is somewhat more complex. Qualified immunity in the context of civil rights cases exists to accommodate two competing social policies. On the one hand damages may be the only means of vindicating constitutional guarantees. On the other hand permitting damage suits against government officials carrying out important discretionary functions entails a high social cost because such suits may unduly inhibit officials from vigorously carrying out their duties. (*Saucier v. Katz* (2001) 533 U.S. 194, 200–202 [150 L.Ed.2d 272, 121 S.Ct. 2151]; *Anderson v. Creighton* (1987) 483 U.S. 635, 638–639 [97 L.Ed.2d 523, 107 S.Ct. 3034].)

Essentially, qualified immunity means that officials may avoid suit and liability not simply when they have acted lawfully but also when, while they have acted unlawfully in an absolute sense, they have nonetheless acted reasonably, under the circumstances. In a search or arrest warrant context, an officer has qualified immunity if, although the warrant he or she sought lacked probable cause, a reasonably well-trained officer would not have realized the defect and would have applied for the warrant. (*Malley v. Briggs, supra*, 475 U.S. at pp. 344–346.) As the court stated in *Malley*: "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable [citation] will the shield of immunity be lost." (*Id.* at pp. 344–345.) "Thus, qualified immunity leaves 'ample room for mistaken judgments,' [citation] and protects 'all but the plainly incompetent or those who knowingly violate the law.' [Citation.]" (*Harman v. Pollock* (10th Cir. 2006) 446 F.3d 1069, 1077.)

The issue of whether qualified immunity exists is ultimately one of law for the trial court. (*Finnegan v. Fountain* (2d Cir. 1990) 915 F.2d 817, 821.) Disputes of historical fact relevant to the issue, however, must be decided by a jury. (*Act Up!/Portland v. Bagley* (9th Cir. 1993) 988 F.2d 868, 873; 1 Steinglass, Section 1983 Litigation in State Courts (2006) § 15.11, pp. 15-76 to 15-80; 2 Coates et al., Cal. Government Tort Liability Practice (Cont.Ed.Bar 4th ed. 2007) § 13.47B, pp. 1100–1103.)

With these considerations in mind, we review the trial court's rulings.

A. *Search Warrant*

The trial court determined that as a matter of law the search warrant was facially invalid and Emmerson was not immune from suit. We conclude to the contrary. A strong case can be made the affidavit submitted in support of the warrant was sufficient. In any case, we conclude Emmerson had qualified immunity from suit because a reasonably well-trained officer would not have realized the affidavit was defective and reasonably would have relied on the warrant issued by the magistrate to conduct the search.

### 1. *Issuance of Warrant*

On June 14, 1999, Detective Emmerson presented to Judge Cole an affidavit in support of a search warrant for Wood's house. Emmerson stated that in December 1998 Walter and Martha Kadyk reported to police they were being stalked by a neighbor, John Wood. They stated they had been friends with Wood for many years but in the last year the relationship had become "cold."

Emmerson stated the Kadyks had been together for 10 years. Before she was married to Walter, Martha was married to Marvin Goss and lived in the same house in which she now lived with Walter. Wood was a friend and neighbor of Marvin and Martha and stayed friends with both through the couple's separation and divorce. When Wood learned Martha was dating and planned to marry Walter, he seemed to be upset and made the comment to her that she " 'did not give him a chance.' " Wood made other comments to Martha that led her to believe he always wanted to "become more than just friends."

The affidavit stated that in the last year, 1998, Wood began dating Janice Walters. Walters moved into Wood's home. During this period the Kadyks noticed Wood became colder and had no contact with them. They stated he would look at their house and watched them as they came and went. On numerous occasions Wood followed Martha and was "seen standing in his driveway, garage, and front living room, just staring at the Kadyks' house to see if he could see them."

Emmerson stated Wood and Martha worked out daily at the same health club. Martha and other persons at the club noticed Wood watch Martha in mirrors or around corners. Wood followed Martha, parked next to her car and "had been continually watching for approximately a one-year period."

The affidavit stated that beginning in November 1998 the Kadyks received and were still receiving numerous hang-up phone calls. In November and December 1998, they received numerous bills from numerous magazines thanking them for their subscriptions and gift subscriptions they ordered. One of the subscriptions was for Ron Sorber, the owner of a restaurant where Wood and the Kadyks had eaten together.

In his affidavit Emmerson stated that paintballs hit the Kadyks' house while they were on vacation and that pool sweeps and other items were taken from their backyard or vandalized.

The affidavit stated that Berl Eldridge, a former customer of Wood's security service, reported that shortly after discontinuing Wood's service

Wood scratched Eldridge's car with a key. Eldridge also stated Wood told him he "keyed" the Kadyks' car while it was parked at the Red Lion Restaurant and Motel in Ontario and stole a pool sweep from their yard. The Kadyks confirmed their car was "keyed" at that location and two pool sweeps were taken from their yard.

Emmerson stated that on March 25, 1999, a neighbor told Walter that Wood asked the neighbor if the Kadyks were on vacation when their house was hit with paintballs. Wood asked other neighbors if they saw the damage. The neighbor believed Wood caused the damage and wanted to make sure everyone saw it.

That affidavit stated that on March 28, 1999, Walter saw Wood sitting in a vehicle talking on a cell phone and for approximately 15 minutes watched the Kadyks' house. Walter believed Wood made the hang-up phone calls and possibly used his cell phone to do so.

The affidavit stated Wood was a retired police officer. Wood told the Kadyks he retired for stress or psychological reasons, that he carries a gun and had guns in his house.

Emmerson stated based on the information related in the affidavit probable cause supported the conclusion felonies, i.e., sections 646.9 (stalking) and 653m (making annoying phone calls) had been committed and evidence concerning those offenses could be found in Wood's house or in his vehicles.

Emmerson sought permission to seize pictures, still or video, of Walter and Martha Kadyk, phone bills, correspondence with magazines, paintball guns and paraphernalia, pool sweeps, weapons and documents showing dominion and control of the premise.

The magistrate found probable cause and issued the warrant.

Various items were seized during the search, including a spray can labeled "Envelope X-Ray Spray," a chemical used to see inside an envelope without opening it, four small bottles labeled "Key Scratch," a chemical used to damage the paint on a car, "Lock-Out Drops," a chemical used to "freeze" locks, "Body Bag Parts," apparently a chemical that smells like a decaying body, and "Stink Bomb," apparently a foul-smelling liquid. Also seized were three firearms.

Also found was a large hardbound book entitled "Encyclopedia of Revenge." The cover of the book states it is "The Most Devastating Book Ever Published." The book is a guide to harassing and taking revenge against

enemies through a list of 1,160 suggested techniques. The techniques vary from the annoying to the potentially lethal and include, shooting paint pellets at house or car, using stink bombs, putting glue in a door lock and subscribing to magazines in the target's name. When found, portions of the Encyclopedia of Revenge listing techniques like those used against the Kadyks were highlighted in yellow marker.

### 2. Trial Court's Ruling

At a hearing at which the only evidence was apparently documents attached to various pleadings, the trial court concluded it was not bound by the decision of the issuing magistrate that Emmerson's affidavit provided probable cause for a search.

In reviewing the affidavit de novo, the trial court concluded it was replete with unsupported conclusions and mere suspicions. The court noted much of the affidavit was based on the hearsay statements of informants whose reliability was not established and whose statements were not corroborated. Additionally, the trial court concluded important information in the affidavit was stale. The court noted the Kadyks contacted Emmerson six months before the warrant was issued. The court observed the conversation quoted in the affidavit in which Wood tells Martha that she never gave him a chance occurred approximately 10 years before the affidavit was sought. The court stated there was little information in the warrant concerning when Wood allegedly followed Martha. The court stated that while the hang-up phone calls were contemporaneous with the affidavit, there was no evidence Wood made them. The court noted the magazine subscription bills were received seven months before the warrant was sought. The court noted in any event there was no evidence Wood was responsible for those subscriptions. The court noted no date was given for when the Kadyk house was hit by paint or when the pool sweeps were taken. Likewise, the court stated there was no indication in the affidavit concerning when the Kadyks' car was allegedly scratched by Wood.

The court next discussed factual misstatements in and omissions from the affidavit. The court concluded Emmerson intentionally omitted the fact that Wood's conversation with Martha concerning not giving him a chance occurred approximately 10 years before the warrant was sought, that the paint incident occurred a year before, when the Kadyks had a friendly relationship with Wood, and the fact the pool sweeps were taken in 1992 and 1996 and that Emmerson failed to mention he was a friend of the Kadyks. The court concluded the omissions did not appear to be innocent. The court stated that an experienced officer would know the omitted information should have been included. The court found that when the omitted information was added, the affidavit was clearly insufficient.

The court stated even if the affidavit was insufficient, there would be no liability if Emmerson relied on the warrant in good faith. The trial court found no such good faith reliance in this case. First, the court found Emmerson misled the magistrate by his omissions from the affidavit, and the affidavit was so lacking in the indicia of probable cause that it would be entirely unreasonable for Emmerson to believe probable cause existed. The court concluded the warrant was facially invalid and the only question that remained was the legality of Wood's arrest.

B. *Discussion*

1. *Search Warrant*

■ The facial validity of the warrant is the initial issue in a civil rights action arising from the claim that a warrant was insufficient. However, the crucial question is the reasonable reliance of the defendant officer on the magistrate's issuance of the warrant. We address the trial court's ruling in that context.

■ Probable cause exists for a search warrant when there is a fair probability that contraband or evidence of a crime will be found in the place to be searched. (*Illinois v. Gates* (1983) 462 U.S. 213, 238–239 [76 L.Ed.2d 527, 103 S.Ct. 2317].) The issuing magistrate need only make "a practical, common-sense decision . . . , given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information . . . ." (*Gates*, at p. 238.) Probable cause describes reasons to be suspicious, not a prima facie case of guilt. (*People v. Thuss* (2003) 107 Cal.App.4th 221, 236 [133 Cal.Rptr.2d 149].) "Probable cause, unlike the fact itself, may be shown by evidence that would not be competent at trial. [Citation.] Accordingly, information and belief alone may support the issuance of search warrants, which require probable cause. [Citations.]" (*Humphrey v. Appellate Division* (2002) 29 Cal.4th 569, 573 [127 Cal.Rptr.2d 645, 58 P.3d 476].)

Because affidavits are often written by nonlawyers in the midst of an investigation, technical requirements for elaborate specificity have no place in the review of search warrant affidavits. (*United States v. Ventresca* (1965) 380 U.S. 102, 108 [13 L.Ed.2d 684, 85 S.Ct. 741, 746]; *People v. Ulloa* (2002) 101 Cal.App.4th 1000, 1006 [124 Cal.Rptr.2d 799].)

In a particular case it may be difficult to determine when an affidavit demonstrates the existence of probable cause; the resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants. (*People v. Weiss* (1999) 20 Cal.4th 1073, 1082–1083 [86 Cal.Rptr.2d 337, 978 P.2d 1257].)

A court reviewing the issuance of a search warrant defers to the magistrate's finding of probable cause unless the warrant is invalid as a matter of law. (See *People v. Thuss, supra,* 107 Cal.App.4th at p. 235.)

The first question here is the facial validity of the search warrant, i.e., viewed as required by the legal principles cited above, was there on the face of the affidavit probable cause for the issuance of the warrant. No issues of historical fact exist at this stage of the inquiry because the question is solely the facial validity of the warrant. We conclude the trial court applied too demanding a test in reviewing the affidavit and erred when it found it was facially invalid and therefore also erred in finding that Emmerson could not reasonably have relied on the warrant.

Emmerson's affidavit is not a model for the writing of such documents. It could include more dates and provide more specific background information concerning its allegations. Still, the law recognizes that affidavits for search warrants are often prepared by nonlawyers in the midst of investigations and may not evidence the precision of a well-written trial brief. As noted, it may be difficult to determine when an affidavit demonstrates the existence of probable cause. In such marginal cases, courts generally find the affidavit is sufficient.

Emmerson states in his affidavit that he seeks a warrant to search Wood's residence for evidence of stalking (§ 646.9) and the making of annoying phone calls (§ 653m).

He notes that in December 1998, Walter and Martha Kadyk complained to police they were being "stalked" by their neighbor, Wood. Emmerson states that while the Kadyks and Wood were friends for many years, within the last year Wood became "cold" and had little contact with them.

The affidavit attempts to suggest a motivation for Wood's harassment by relating that although Wood was a longtime friend of the Kadyks, as well as Martha and her former husband, Wood at some point was apparently upset because Martha, after her divorce from her first husband, did not give Wood a chance to develop a romantic relationship with her. This contention is based on Martha's interpretation of various comments made to her by Wood. The exact or even general dates of these comments are not stated. It is noted that Walter and Martha at the time of the affidavit had been together for 10 years, suggesting the possibility that some or all of the statements were made long before Wood apparently became unfriendly.

It would have been helpful had the affidavit been more specific concerning this claim of a possible motivation. Still, the information concerning Wood's

apparent disappointment that Martha did not give him a chance for a romantic relationship with her provides at least some context for later statements in the affidavit concerning Wood's possible fixation with Martha. It might also explain why he would follow and harass her. In any event, while a motivation for Wood to harass the Kadyks was relevant to concluding he was stalking them, it was not essential. Ultimately, what was important was what he was doing, not why he was doing it.

For reasons that are not entirely clear, Emmerson notes in his affidavit that in the last year Wood began dating Janice Walters, who eventually moved into his house. The affidavit notes in that period Wood became even colder towards the Kadyks. Emmerson states the Kadyks noted during that period they saw Wood looking at their residence. He watched as they came and went. The affidavit notes in that period Wood followed Martha on "numerous occasions." Wood was seen standing in his driveway, garage and living room staring at the Kadyks' house.

Apparently based on statements made to Emmerson by Martha, the affidavit states Martha and Wood worked out at the same gym. Martha and some of her friends noticed Wood watching Martha. The affidavit notes Wood followed Martha, was seen in the same parking lots as her and would park his car next to hers. The affidavit indicates this activity occurred over the proceeding year.

The affidavit notes that during November and December 1998, the Kadyks received numerous hang-up phone calls. The calls could not be traced to Wood. Emmerson also notes that during those same months the Kadyks received numerous bills for magazine subscriptions they did not order. One gift subscription was for Sorber. The affidavit notes Emmerson determined that Sorber owns a restaurant in Dana Point where Wood and the Kadyks had eaten together.

The affidavit also notes the Kadyks' home was vandalized when paintballs hit their residence while they were on vacation and that pool sweeps were taken from their yard or vandalized. No date was given for when the thefts and vandalism occurred.

The affidavit, thus, presented information related by the Kadyks that Wood was acting in unusual and unsettling ways by staring at them and their house and by following Martha. The affidavit also related acts of harassment, e.g., the calls, the magazine subscription orders and the acts of vandalism, that would reasonably support the conclusion the Kadyks were being stalked. No direct evidence linked Wood to these latter acts of harassment. The affidavit, however, related circumstantial evidence supporting a reasonable suspicion that Wood was responsible for the harassment.

In addition, the affidavit notes Eldridge contracted for services provided by Wood's business. Shortly after Eldridge cancelled Wood's service, Wood vandalized Eldridge's car by scratching it with a key. The affidavit notes Eldridge told investigating officers that Wood admitted he had "keyed" the Kadyks' vehicle when it was parked at a particular restaurant and that he stole pool sweeps from the Kadyks' swimming pool. The affidavit notes the Kadyks confirmed their car was keyed at the location described by Eldridge and that two pool sweeps were taken from their yard. The affidavit does not specifically state the source of this information, but the reference in the affidavit to Eldridge advising investigating officers of the facts suggests Emmerson got the information from either the officers or their reports.

 The statements of Eldridge are crucial to the sufficiency of the affidavit. Eldridge's statements support a conclusion that, for whatever reasons, Wood was angry with and prepared to take harassing actions against the Kadyks. Not only did he admit he keyed their car, but also he admitted taking their pool sweeps. While it would have been helpful had dates been given for these acts, whenever they occurred they allowed the reasonable suspicion that it was Wood who, over a fairly recent period of time, harassed the Kadyks by phoning them repeatedly and ordering magazine subscriptions in their name. Eldridge's statements provided at least some corroboration for the Kadyks' report of Wood's stalking activity directed at Martha.

As to the sources of the information in the affidavit, we conclude the trial court was too demanding. The trial court was concerned that no showing was made concerning the reliability of the persons who provided the information related in the affidavit and the information was not corroborated. The crucial information in the affidavit came from the Kadyks and Eldridge. Both were crime victims and there is nothing inherent in their relationship to the case, to Wood or to police that suggests additional information concerning their honesty or good faith was essential. (See generally *People v. Hill* (1974) 12 Cal.3d 731, 761 [117 Cal.Rptr. 393, 528 P.2d 1].)

Likewise, we conclude the trial court erred in concluding the information in the affidavit was fatally stale. As we have stated repeatedly, the affidavit can justifiably be criticized for its lack of specificity and absences of dates. Nonetheless, the core criminal activity in this case was a pattern that occurred over a period of time. What was important was there was information that Wood's harassing activity, e.g., following Martha, was continuing and other harassing activity, e.g., the phone calls, had occurred fairly recently. The affidavit as a whole suggested the activity was continuing and would continue in the future. It was reasonable to conclude based on the affidavit that Wood was harassing the Kadyks and stalking Martha, that the activity would continue and that evidence of his conduct could be found in Wood's house.

A further criticism of the affidavit not mentioned by the trial court is the limited information provided that the Kadyks, and in particular Martha, were being stalked by Wood and information concerning that felony could be found in Wood's house.[3] In 1999 the felony of stalking occurred when any person willfully, maliciously and repeatedly followed or harassed another person and made a credible threat with the intent to place that person in fear for their safety or the safety of their immediate family. (Former § 646.9, as amended by Stats. 1998, ch. 825, § 4, and Stats. 1998, ch. 826, § 1.)

Within the meaning of the statute, "harasses" meant "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person . . . ." (Former § 646.9, subd. (e), as amended by Stats. 1998, ch. 825, § 4, and Stats. 1998, ch. 826, § 1.)

The statute defined a "course of conduct" as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." (Former § 646.9, subd. (f), as amended by Stats. 1998, ch. 825, § 4, and Stats. 1998, ch. 826, § 1.)

Within the meaning of the statute, a "credible threat" could be conveyed verbally or in writing or it could be implied by a pattern of conduct made with the intent to place the target person in reasonable fear for their safety and with the apparent ability to carry out the threat. (Former § 646.9, subd. (g), as amended by Stats. 1998, ch. 825, § 4, and Stats. 1998, ch. 826, § 1.)

The affidavit reports a continuing pattern of activity, some that could, in light of the admission to Eldridge, be reasonably attributed to Wood, e.g., the calls, magazine subscriptions, etc., and some that were directly attributed to him, e.g., following Martha. We conclude the information contained in the affidavit reasonably allows the conclusion that Wood was stalking the Kadyks, and in particular Martha, and evidence of that crime could be found in his house.

The search warrant for Wood's home was facially sufficient.

In any case, we conclude Emmerson was qualifiedly immune from suit because a reasonably well-trained officer would not have realized the affidavit

---

[3] The affidavit states there is probable cause to believe the property to be seized constitutes evidence tending to show the felonies of stalking (§ 646.9) and making annoying phone calls (§ 653m) were committed. Making annoying phone calls is not a felony. The warrant was sought pursuant to section 1524, subdivision (a)(4), a section that applies only to searches for evidence tending to show that a felony has been committed or a particular person has committed a felony.

was defective and would reasonably have relied on the warrant issued by the magistrate to conduct the search.

■ This, however, does not end the inquiry. In deciding if there is probable cause to search, it is relevant whether the affidavit in support of the warrant contains either material affirmative misrepresentation or material omissions. An affirmative misrepresentation is material if there is no probable cause absent consideration of the misrepresented fact. An omission is material when it casts doubt on the existence of probable cause. When there is no factual dispute, the materiality of affirmative misrepresentation and omissions is a question of law. (*Crowe v. County of San Diego* (S.D.Cal. 2004) 303 F.Supp.2d 1050, 1070–1071.)

The trial court found Emmerson intentionally omitted from his affidavit that the conversation in which Wood indicated to Martha his consternation at her failure to give him a chance for a romantic relationship occurred years before the acts of harassment. There is no indication Emmerson omitted this fact to deceive the magistrate. As we have noted above, the inclusion of this conversation was an attempt to explain why Wood seemed to have a fixation with Martha and to provide some possible motive for the stalking and harassing behavior the affidavit attributed to him. While it would have been better had Emmerson included a date for the conversation, we do not believe the conversation is crucial to a finding of probable cause. The failure to provide a date is not materially misleading.

The trial court also found material the failure of the affidavit to mention that the paintball incident and the theft of the pool sweeps happened years before the search warrant was sought. We disagree. Again, dates and a greater concern for detail would have made for a better affidavit. Nonetheless, the situation indicated by the warrant was that the Kadyks and Martha in particular were still the subject of harassment by Wood. The warrant made no secret that some forms of this harassment, e.g., the ordering of magazine subscriptions, occurred months before the warrant was sought. What was important was that the harassing behavior was at least in some forms continuing, which is, after all, the nature of stalking.

Some forms of harassment mentioned in the warrant could not be directly tied to Wood, e.g., the paintball incident; some of the acts in the warrant he admitted to Eldridge, e.g., the theft of the pool sweeps and the car scratching incident. The dating of the various acts of harassment was important not because of any claim or representation that they were contemporaneous with the affidavit but because taken together they showed a pattern of harassing behavior that in some forms at least was continuing and that could, in light of his admission to Eldridge and Martha's reports of his behavior, reasonably be attributed to Wood.

We conclude there were no material misrepresentations or omissions in Emmerson's affidavit.

### 2. *Arrest*

After finding the search warrant was facially invalid, the trial court considered the legality of Wood's arrest. After an evidentiary hearing on the issue the court found Emmerson arrested Wood immediately after entering the house, there were no exigent circumstances justifying such an arrest and it was, therefore, illegal. (See generally *People v. Thompson* (2006) 38 Cal.4th 811, 817 [43 Cal.Rptr.3d 750, 135 P.3d 3].) Because we have concluded the search warrant was valid, our consideration of the legality of Wood's arrest follows a different analytical path.

■ Probable cause exists when the facts known to the arresting officer would persuade someone of reasonable caution that the person to be arrested has committed a crime. The concept is a fluid one—turning on the assessment of probabilities in a particular factual context. Although probable cause cannot be precisely defined, the core of the concept is that a reasonable ground for belief of guilt exists and that belief must be particularized with respect to the person to be arrested. (*People v. Thompson, supra,* 38 Cal.4th at p. 818.)

A factual dispute existed in this case concerning the precise time at which Emmerson arrested Wood. Emmerson testified that when he entered Wood's house to execute the warrant, he searched him and placed him in handcuffs but did not tell him he was under arrest. It was only after finding additional evidence in the house, e.g., the Encyclopedia of Revenge, with passages highlighted that dealt with techniques used to harass the Kadyks, that he concluded probable cause existed to arrest Wood.

The trial court found Emmerson arrested Wood after entry into his house and before the search and that, in any event, there was no probable cause to arrest Wood for stalking the Kadyks.

As noted, we have concluded the search warrant was properly issued or at the very least that Emmerson reasonably relied on it and, therefore, he lawfully entered and searched Wood's house. That being the case, there was no requirement that some exigency exist before Emmerson could lawfully arrest Wood in his home.

■ We further conclude that under the facts of this case there is no significance to whether Emmerson made the "arrest" immediately upon entering Wood's home or later after Emmerson found additional incriminating

evidence. The issuance of a search warrant implicitly carries with it the limited authority to detain the occupants of the premises while a search is carried out. (*People v. Glaser* (1995) 11 Cal.4th 354, 365 [45 Cal.Rptr.2d 425, 902 P.2d 729].) When it is reasonable to do so, e.g., when the warrant authorizes a search, as here for firearms, occupants may be handcuffed for the safety of the officers and themselves. (*Muehler v. Mena* (2005) 544 U.S. 93, 98–100 [161 L.Ed.2d 299, 125 S.Ct. 1465].)

Whatever Emmerson's subjective intention with regard to arrest, Wood was properly going to be detained in his house in handcuffs while the search was carried out. At the end of the search, Wood was transported to jail. In any sense relevant to Wood's constitutional interests, whether he was formally "arrested" at the beginning of the search or at its end is of no consequence. The only significant question is whether there was probable cause to arrest him before he was transported from his home. Until the moment of transportation, the holding of Wood in custody was fully justified by the search warrant and the reasonable circumstances of its execution.

The issue then is whether the facts known to Emmerson before Wood was transported from his home provided probable cause to arrest. Probable cause to arrest exists if there are circumstances sufficient to warrant a prudent person's belief that the suspect has committed an offense. (*Beck v. Ohio* (1964) 379 U.S. 89, 91 [13 L.Ed.2d 142, 85 S.Ct. 223].) Based on facts related in the affidavit for the search warrant alone, Emmerson might reasonably have believed Wood engaged in stalking and harassing conduct directed at the Kadyks.

In addition to the information related in the affidavit, Emmerson had other information concerning Wood's activities relevant to the case. Over a month before the search of Wood's house, Emmerson talked to Wood's ex-girlfriend Janice Walters. Walters told Emmerson she was afraid of Wood. She stated she was afraid Wood would harass her and she feared for her life. When Emmerson told Walters he was investigating a stalking case involving the Kadyks, Walters stated: "Those poor people." When asked to explain, Walters stated: "The harassment that John [Wood] was doing." Walters stated she was aware Wood placed magazine subscriptions in the Kadyks' name.

We conclude there was probable cause for Emmerson to arrest Wood.

In light of our conclusions, it is unnecessary we consider Emmerson's claim there was insufficient evidence to support the $900,000 award of damages and the additional award of attorney fees.

## DISPOSITION

The judgment is reversed and the trial court is directed to enter a judgment in favor of defendants. Appellants to recover costs on appeal.

Huffman, J., and McDonald, J., concurred.

A petition for a rehearing was denied November 9, 2007, and respondent's petition for review by the Supreme Court was denied January 23, 2008, S158462.