FILED
United States Court of Appeals
Tenth Circuit

November 18, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MELISSA HARMAN and JUSTIN OVERTON,

        Plaintiffs - Appellants,

v.

BRENT POLLOCK, Officer, Department of Public Safety, State Bureau of Investigations, City of Salt Lake, State of Utah; SCOTT BARNETT, Officer, Department of Public Safety, State Bureau of Investigations, City of Salt Lake, State of Utah,

        Defendants - Appellees.

No. 08-4068

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:03-CV-558-DAK)**

---

Robert B. Sykes and Alyson E. Carter, (with Scott R. Edgar on the brief), Robert B. Sykes & Associates, P.C., Salt Lake City, Utah, for Plaintiffs-Appellants.

J. Clifford Petersen, (with Mark L. Shurtleff, Utah Attorney General, on the briefs), Assistant Utah Attorney General, Salt Lake City, Utah, for Defendants-Appellees.

---

Before **HENRY**, Chief Judge, **BRISCOE** and **LUCERO**, Circuit Judges.

---

**HENRY**, Chief Judge.

_____

In this ongoing action under 42 U.S.C. § 1983, a previous panel of this court determined that various material factual disputes remained regarding the constitutionality of the near two-hour early morning detention of Melissa Harman and Justin Overton (or the "Plaintiffs"), and the corresponding after-midnight searches of their garage apartment conducted by officers who worked for the Utah Department of Safety. After the panel's remand, the district court allowed further discovery, and, after reviewing the parties' motions for summary judgment, granted summary judgment to the defendant officers. With a satisfactorily comprehensive record before us, but with some pause and a few clarifications, we agree with the district court's conclusions that the defendants' discovery of marijuana ultimately gave them reason to detain the couple, to seize the marijuana, and to perform two more searches of the apartment. We thus affirm the district court's grant of summary judgment to the officer defendants, but we utilize some different reasoning.

## I. BACKGROUND

We need not recount all of the facts that are set out in detail in _Harman v. Pollock_, 446 F.3d 1069, 1072-76 (10th Cir. 2006) ("_Harman I_"), except as they are relevant to this appeal.

## A. *Harman I*

In February 2003, the Plaintiffs rented and resided in the garage apartment at 44 ½ West 2700 South in South Salt Lake, Utah. Defendant Brent Pollock, a narcotics agent with the Utah Department of Public Safety's Bureau of Criminal Investigations, had suspected the residents of the adjacent 44 West 2700 South home of drug dealing and had been investigating and observing them over a period of seven months. Plaintiffs moved in approximately six weeks before the night in question. Agent Pollock was the case agent for the investigation and he performed a search of the garage apartment after the initial entry. Agent Pollock also directed another officer to conduct a "K-9" search of the apartment.

Defendant Scott Barnett (together with Agent Pollock, the "Officers") was a Sergeant with the Utah Department of Public Safety, to whom the investigating team answered. After the initial entry and the garage apartment was secured, Sergeant Barnett entered the apartment, and detained and questioned the Plaintiffs.

After some time surveilling the suspected drug activity of Ignacio Ascention (known as "Pawoo") and Conception Rodriguez (known as "Isabel"), who resided at 44 West 2700 South, Agent Pollock completed an affidavit in support of an application for a search warrant. The search warrant included "any and all outbuildings . . . of the property," and included a "detached garage," which was the Plaintiffs' residence:

the premises known as: 44 West 2700 South, South Salt Lake City, Utah,

3

a white house, brown roof, front door faces south, small wood fence to the west of the door across the front, # 44 on the wall to the right of the front door, a detached garage to the rear of the house on the east side.

Aplts' App. vol. I, at 210, 211. Utah's State Bureau of Investigations coordinated entry with its internal SWAT team unit known as a SERT (Special Emergency Response Team). On a cold February 13, 2003, after a 12:46 a.m. raid, the handcuffed Plaintiffs were placed in a van; the SERT officers quickly secured the scene; Sergeant Barnett interviewed the Plaintiffs; Agent Pollock searched the apartment and authorized a K-9 search; and finally, the Plaintiffs were cited for marijuana possession and released after 2:35 a.m.

In their § 1983 complaint, the Plaintiffs maintained that the post-midnight raid and the subsequent searches of their apartment and the accompanying detention violated their Fourth Amendment rights. In our prior decision in this case, we rejected the Plaintiffs' contention that the warrant did not sufficiently describe the area to be searched. Relying on *Maryland v. Garrison*, 480 U.S. 79, 87 (1987), we acknowledged that the search warrant's description of the property to be searched was overbroad, and constituted more than a clerical error. *Harman I*, 446 F.3d at 1078. But, despite some inconsistencies in the legal title research, and with some admonitions regarding the sanctity of the home, we concluded that the warrant described the premises with adequate particularity. *Id.*

Next, we rejected Plaintiffs' suggestion that Agent Pollock intentionally omitted and misstated material information in his affidavit in support of the search

4

warrant. *Id.* We then concluded that the Officers were reasonably mistaken when they shattered windows and broke down the front door during the *initial* entry into Plaintiffs' garage apartment. *Id.* at 1081-82. Again citing *Garrison*, we reasoned that "'the objective facts available to the officers at the time suggested no distinction between [the targeted house and the garage apartment.]'" *See id.* at 1082 (quoting 480 U.S. at 88) (alterations supplied). Despite various factors that might suggest the existence of two separate residences,[1] "[g]iven the facial validity of the warrant, the officers permissibly entered the separate residence." *Id.*

When we considered the reasonableness of the subsequent search and detention of the Plaintiffs, however, we concluded that material facts remained in dispute as to (1) the reasonableness of the Officers' delay in realizing they were in a separate residence; (2) whether the subsequent search took place after this realization; and (3) the reasonableness of the Plaintiffs' lengthy detention. In

---

[1] These factors included (1) the simultaneous raids of "residence # 1" and "residence # 2," (2) the three separate mailboxes (two on 44 West 2700 South and one on 44 ½ West 2700 South), (3) the deed of trust, which indicated the property encompassed two separate lots, (4) the U.S. Postal Service records, which listed 44 ½ 2700 South as a separate address, (5) the gas bill for 44 West 2700 South in Ms. Harman's name, (6) the scout team's inspection of the front door hinges, and presumably, the residential type front door and the porch, porch light, rug etc., on 44 ½ West 2700 South, (7) the residential windows on 44 ½ West 2700 South, (8) the New Mexico license plates on Ms. Harman's car, (9) the cement walkway and landscaping, and (10) separate telephone service. 446 F.3d at 1080.

connection with the detention, we acknowledged that while

> some portion of the detention may have been justified based on the presence of a small amount of marijuana, the district court did not reach this argument, and thus we ha[d] no factual findings or credibility determinations on this matter from the district court. In addition, the parties do not address the sizeable difference between seizing a person or property in an open area, and the seizing of property or persons "situated on private premises to which access is not otherwise available for the seizing officer."

*Id.* (quoting *Payton v. New York*, 445 U.S. 573, 587 (1980)). We remanded for further factual findings, and we asked the district court to hold additional hearings as necessary as to the arguments regarding the Officers' authority to detain the plaintiffs and to the applicability of the plain view doctrine.

## B.    The district court's conclusions on remand

After remand, the district court allowed additional discovery. Both parties sought summary judgment. After concluding the searches and seizures were valid, the district court granted the Officers' motion for summary judgment.

First, the district court found that their "detention was a proper investigatory detention as established by *Terry v Ohio*," 392 U.S. 1, 20 (1968). Aplts' App. vol. III, at 830. The court, citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981), recognized that *Terry* stops do not typically take place in the home, but noted they are not confined to momentary on the street detentions, and that they are not subject to rigid time restrictions. *Id.* at 830-31 (citing *Summers*, 452 U.S. at 704-05 ("If the evidence that a citizen's residence is harboring contraband is sufficient

6

to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home."); and *United States v. Sharpe*, 470 U.S. 675, 685 (1985) (stating that "our cases impose no rigid time limitation on *Terry* stops")).

Second, the district court concluded that the discovery of the marijuana and pipe suggested that Plaintiffs were involved in criminal activity. The district court noted that the Officers suspected that the main house residents used the garage apartment to store and use drugs. The surveilling officers had seen lights on and heard voices in the building, and knew that the suspects had children. The district court determined that the Officers might have reasonably believed the garage apartment was being used to keep the drugs away from the children. The court also credited Sergeant Barnett's conclusion that Ms. Harman's New Mexico ties increased the likelihood of her association with the main house's Hispanic suspects. And, according to the district court, the Officers detained the Plaintiffs only as long as reasonably necessary.

Third, the district court concluded that the Officers' discovery of marijuana and the pipe standing alone provided reasonable suspicion to detain the Plaintiffs. The district court also found that Agent Pollock's search of the garage apartment was justified by probable cause and, in the alternative, exigent circumstances. The district court further found that Sergeant Barnett had no personal involvement in

7

the searches, and that Agent Pollock had no personal involvement in the detentions. Finally, the court determined the Officers did not violate clearly established law, and that the Officers' behavior was objectively reasonable, and that the Officers were entitled to qualified immunity.

While we disagree with the district court that *Terry* provides the appropriate framework for analyzing the Plaintiffs' detention, and we give no credence to connections with the State of New Mexico, we do agree with the court's ultimate conclusion that the Officers' conduct was objectively reasonable. *See Lambertsen v. Utah Dep't of Corr.*, 79 F.3d 1024, 1029 (10th Cir. 1996) (stating that we are "free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court" (internal quotation marks omitted)). The Officers' reasonable belief that the garage apartment served as a "crash pad," coupled with the Officers' plain view sighting of the marijuana and pipe, justified the detention and searches. The detention, the subsequent searches and the K-9 search were reasonable (although a separate search warrant would have been preferable) because the Officers had not confirmed the Plaintiffs were not connected to the illegal activity at the main house until all of Sergeant Barnett's interviews were complete, which was nearly two hours after the initial intrusion.

## II. DISCUSSION

The Plaintiffs maintain that their two-hour plus detention, Agent Pollock's

8

search, and the K-9 search were invalid, pointing to the immediate apparency that the garage apartment was a separate residence, and that they were clearly unrelated to the drug-ring suspects. They also challenge the propriety of a home-based investigatory detention under *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Finally, they challenge the district court's findings that Agent Pollock, as case agent, and Sergeant Barnett, the officer with full operational command of the scene, were alternatively not liable because they lacked personal knowledge of the detainment and searches.

Although the matter is close, after reviewing the additional discovery, we hold that the undisputed material facts support the district court's ruling that the searches and detention were reasonable. Although we reject the district court's determination that *Terry* provides the framework for our analysis, we conclude that the Officers acted reasonably under the rules of *Maryland v. Garrison* when they detained the Plaintiffs until confirming that they had no involvement with the main house drug ring. We therefore affirm the district court's grant of summary judgment in favor of the Officers.

## A.     Standard of Review

We review a grant of summary judgment on the basis of qualified immunity de novo. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and one party is entitled to judgment

9

as a matter of law.  Fed. R. Civ. P. 56(c).  "We construe the record in the light most favorable to the non-moving party."  *Jiron v. City of Lakewood,* 392 F.3d 410, 414 (10th Cir. 2004) (citation omitted).  There is a genuine issue of material fact "if the [nonmoving party] presents facts such that a reasonable jury could find in favor of the [nonmoving party]."  *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999) (citation omitted).  "If there is no genuine issue of material fact in dispute, we determine whether the district court correctly applied the substantive law."  *Id.*

In a case such as this one, when a defendant invokes qualified immunity, the plaintiffs "must show that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred."  *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 841 (10th Cir. 2005) (internal quotation marks omitted).  In *Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009), the Supreme Court held that federal courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 818.

"Requiring the law to be clearly established provides defendants with 'fair warning' that their conduct is unconstitutional."  *Mimics*, 394 F.3d at 842 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002)).  "'The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly

10

established weight of authority from other courts shows that the right must be as plaintiff maintains.'" *Id.* (quoting *Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003)). To be clearly established,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted). Thus, qualified immunity leaves "'ample room for mistaken judgments,'" *id*. at 655 n.8 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)), and protects "all but the plainly incompetent or those who knowingly violate the law." *Id*. at 638 (quoting *Malley*, 475 U.S. at 341).

**B. The Officers' justifiable belief that the Plaintiffs' apartment was connected to illegal drug use was sufficient to render the searches and detention reasonable under the Fourth Amendment.**

We begin with the Plaintiffs' pivotal challenge: they contend that the Officers were put on notice, upon or just after the initial entry into the apartment, that the garage apartment was a separate and distinct residence from the main house under investigation. At that time, Plaintiffs argue, the Officers should have "le[ft] immediately," Aplts' Br. at 25, under the Supreme Court's ruling in *Maryland v. Garrison*, 480 U.S. at 87. Because they continued the detention and the searches, the Plaintiffs contend, the Officers violated the Fourth Amendment.

11

In response, the Officers argue that, even after entering, they reasonably believed that the Plaintiffs' garage apartment was a "crash pad" that was used to store and use drugs connected to the main residence. Importantly, in the Officers' view, the reasonableness of the detention and search is *not* undermined by the evidence that the garage apartment was a separate residence: despite that evidence, apparent on their initial entry, they maintain that they still reasonably believed that the Plaintiffs were connected to the illegal activity at the main residence. The Officers further contend that the discovery of the marijuana in the Plaintiffs' apartment provided additional justification for the detention and searches. Finally, the Officers argue that the detention and searches were justified by exigent circumstances.

We are persuaded, in part, by the Officers' arguments. We hold that the totality of the evidence supporting the "crash pad" theory, combined with the discovery of the marijuana upon entry, establishes that the search and detention were reasonable under the Fourth Amendment. However, we reject the Officers' argument that the detention and searches were justified by exigent circumstances.

1. ***Maryland v. Garrison* is the controlling authority to determine the reasonableness of the detention and the subsequent searches**.

The Plaintiffs are correct that *Maryland v. Garrison*, 480 U.S. 79, 87 (1987), is the controlling authority. Under *Garrison*, once the Officers "were put on notice of the risk" that they entered a home that was unconnected to the illegal

12

activity described in the warrant, they had an immediate duty to retreat. *See id.*

*Garrison*'s holding is directed at searches, but in light of related precedent, its analysis applies to detentions as well. In particular, the Supreme Court has held that officers executing a search warrant for contraband have the authority "to detain the occupants of the premises while a *proper* search is conducted." *Summers*, 452 U.S. at 705 (emphasis supplied); *see also Muehler v. Mena,* 544 U.S. 93, 98 (2005) (observing that "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'") (quoting *Summers*, 452 U.S. at 705); *Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995) (applying *Garrison* to determine "what searches and seizures . . . took place after the mistake [the officers were in the wrong residence] was known"). Thus, under *Summers*, an officer's authority to detain the occupant of a residence while searching for contraband pursuant to a warrant lasts only as long as the search is proper. 452 U.S. at 705.[2]

---

[2] As we have noted, the district court concluded in part that the entirety of the Plaintiffs' detention was proper under *Terry*, 392 U.S. at 20. We disagree. The Ninth Circuit has repeatedly and ably explained why *Terry* generally does not apply within one's home. *See United States v. Washington*, 387 F.3d 1060, 1067 (9th Cir. 2004) ("*Terry*'s twin rationales for a brief investigatory detention-the evasive nature of the activities police observe on the street and the limited nature of the intrusion-*appear to be inapplicable to an encounter at a suspect's home.*") (internal citations omitted) (emphasis added); *United States v. Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005) ("Certainly, the usual rules pertaining to *Terry*-stops

(continued...)

13

**2.      The Officers' "crash pad" theory finds support in the record.**

On remand, the Officers put forth a "crash pad" theory, explaining that they suspected the main home's occupants used the garage apartment as a place to store and use drugs.  The district court found this explanation credible and further concluded that "[t]he indicia of a dwelling [observed by the Officers after they entered the Plaintiffs' apartment] did not so thoroughly dispel this idea [of a crash pad] as to dispel probable cause."  Aplts' App. vol. III, at 840.

In support of the crash pad theory, the district court noted that Agent Pollock knew the main home's suspects had young children, and believed that the suspected dealers wanted to keep the drug storage and usage away from the children.  (There was also testimony, however, that perhaps weighed against this theory – Isabel "would bring her children along when she was selling cocaine." *Id.* vol. II, at 382; *see id.* at 386.)  After remand, further discovery indicated that Agent Pollock thought Ms. Harman was actually "living in the main house and had just gone out to the garage temporarily" or perhaps she had gone "out to the garage partying."  *Id.* at 372.  And, although Agent Pollock did not suspect her to be a "known character[] in the investigation" (presumably based on the seven

_____

[2](...continued)
do not apply in homes.").

        Here, it is *Garrison* and *Summers*, not *Terry*, that provide the proper framework for analyzing the Plaintiffs' detention.  In particular, the validity of the detention of the Plaintiffs stands or falls on the validity of the ongoing search.

14

months of surveillance of the main house, where he observed only Hispanic-appearing suspects), *Harman I*, 446 F.3d at 1073, 1085, after discovering that Ms. Harman was involved, he believed she was "just somehow intertwined in this." Aplts' App. vol. III, at 682.[3]

Although the Officers did not previously assert the crash pad theory per se, they did put forth a similar theory below. "It was the experience of the Defendants that people sleep all over the place in drug homes, so a person sleeping in the garage did not necessarily mean to the Defendants that the garage was a separate residence from the house." Officers' Br. filed 4/13/2005. (We must note that the Officers' related assertion in this appeal that they believed Isabel and Pawoo might utilize a crash pad for the well-being of their children is less tenable, given that Officer Pollock's reconnaissance team reported no sightings of these two entering the garage over a course of seven months, and given Officer Pollock's earlier characterization of the garage as a "little workshop." *See Harman I*, 446 F.3d at 1085; Aplts' App. vol. III, at 683.)

Nevertheless, Sergeant Barnett noted that "drug dealers often use garages or back places" and "[t]hey sleep wherever." Aplts' App. vol. II, at 417. Sergeant

---

[3] Although Ms. Harman's name was mistakenly on the utility gas bill for the main house on January 16, 2003 (long after the surveillance began), the surveilling officers had never seen anyone resembling Ms. Harman, except perhaps that her "features may have been consistent with purchasers of drugs" from the main house. *Harman I*, 446 F.3d at 1076.

15

Barnett noted that he has "found people that have had a bed in the garage next to their drug dealing area or next to the meth lab . . . ." *Id.* Other SERT officers confirmed that in the execution of similar warrants, the discovery of outbuildings with electricity and a sink was not uncommon. *Id.* at 432; *see id.* at 454 ("A lot of times we go into these separate garages and things like that that have those facilities that are cooking meth."); *id.* at 425 ("[A] lot of narcotics people selling or distributing narcotics don't like to do it out of their home itself.").

Sergeant Barnett also stated that it was not until he "interviewed Mr. Overton, Ms. Harman, and the occupants of the [main] house" that he realized that the rear building and its occupants were not part of the drug dealing operation at the main house. *Id.* at 414. According to Sergeant Barnett, under department procedures, the officers would take everyone into custody, and question them to determine whether or not the officer was in the correct location. *Id.* at 260; *but see id.* at 237 (Testim. of Sergeant Pollock: "They were restrained. They *weren't* taken into police custody." (emphasis supplied)).

We agree with the district court's analysis of this evidence. We must "defer to trained law enforcement personnel, allowing officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007) (alteration and internal quotation marks omitted); *see also United States v. Winder*, 557 F.3d

16

1129, 1133 (10th Cir. 2009).  Here, the Officers invoked their experience in investigating drug trafficking offenses to support their theory that the garage apartment might have been used by the suspects in the main residence.  Relying upon the Officers' expertise, to the extent that the garage apartment reasonably appeared to be an extension of the main residence, they acted reasonably.  Under the unique facts of this case, it was not until after the completion of Sergeant Barnett's interviews that they "discovered that there were two separate units. . . and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant."  *Garrison*, 480 U.S. at 87.  Thus, under the circumstances of this case, the Officers' failure to realize the overbreadth of the warrant until after the conclusion of the interviews was objectively understandable and reasonable.[4]

---

[4]  Although the dissent recognizes the "measured balance" the Supreme Court struck in *Garrison*, it then suggests we have "upset[] that balance."  Dissent at 7.  But we must apply the measured directive as instructed by *Garrison*:

> The *Garrison* Court's ultimate directive remains salient: "The officers' conduct and the limits of the search [are] based on the information available as the search proceed[s]." *Id.*  This principle, along with a recognition of "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants," *Garrison*, 480 U.S. at 87 (footnote omitted), is what must guide us in determining if and when the execution went awry.

*United States v. Ritter*, 416 F.3d 256, 266 (3d Cir. 2005) (alternations supplied).  This is the exact approach we have adopted.  Clearly the SERT officers recognized the garage to be an apartment soon after their justified entry.  But *Garrison* teaches that is not the end of the matter.  The warrant's language encompasses a "detached garage" and "any and all outbuildings . . . of the

(continued...)

17

**3.     The Officers' discovery of the marijuana in the Plaintiffs' apartment provides additional support for the detentions and searches**.

As we noted in *Harman I*, "[t]he plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity."  446 F.3d at 1087 (quoting *Illinois v. Andreas*, 463 U.S. 765, 771 (1983)).  "Of course, if the police officers' presence in the home itself entailed a violation of the Fourth Amendment, no amount of probable cause to believe that an item in plain view constitutes incriminating evidence will justify its seizure."  *Id.* (quoting *Soldal v. Cook County, Ill.*, 506 U.S. 56, 66 n.10 (1992)).

To prevent the plain view doctrine from eviscerating Fourth Amendment

_____

[4](...continued)
property."  Aplts' App. vol. I, at 210, 211.  The dissent seems to suggest that the conversion of this garage to a residence means that it is no longer a "detached garage" or part of the "outbuildings."

But the SERT officers also saw marijuana in plain view, were familiar with crash pad type living situations, and soon learned that Melissa Harman was a resident whose name also appeared on the Questar gas bill for the main house, all of which suggested the quarters may have been part of the main house or its operations as well.  Given these considerations and the latitude we afford officers and their expertise, it falls squarely within the *Garrison* directive to allow the officers a reasonable amount of time to confirm that the apartment-cum-reconfigured-detached-garage was "erroneously included within the terms of the warrant."  *Garrison*, 480 U.S. at 87.

protections, we have imposed a three-prong test that the government must satisfy to justify its application. In particular, the government must establish that: "(1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent–i.e.[,] the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself." *United States v. Soussi*, 29 F.3d 565, 570 (10th Cir. 1994).

Here, there is no dispute as to the second requirement–the incriminating character of the marijuana was "immediately apparent." *Id.* The first and third requirements turn on a question of timing, i.e., whether, when they observed the marijuana, the Officers were validly executing the warrant. The answer to that question turns on the *Garrison* analysis, i.e., whether, at some point *before* they observed the marijuana, the Officers knew or reasonably should have known that they had entered a home that was unconnected to the illegal activity described in the warrant, therefore triggering an immediate duty to retreat. *Garrison*, 480 U.S. at 87. If so, the plain view doctrine is inapplicable.

On that issue, there was some testimony that the SERT officers had secured the garage apartment before the pipe and marijuana were discovered. Aplts' App. vol. II, at 540 (SERT Officer Todd Leiendecker: "[O]nce the lights were turned on I did a quick scan of the area . . . the lights were turned on because the building was secured."). Similarly, SERT Officer Kirk Christensen recalled seeing

19

marijuana and the pipe on the counter "[w]hen [he] came back in[to the apartment]." *Id.* at 449. SERT Officer Daniel Fuhr testified that there was "marijuana out in the open." *Id.* at 452. Evidently, the SERT officers secured the residence, and the only persons remaining in, or allowed to enter, the garage apartment were State Bureau of Investigations officers, including Sergeant Barnett and Agent Pollock.

We conclude that when the SERT officers saw the marijuana in the Plaintiffs' apartment, and when Sergeant Barnett and Agent Pollock entered the apartment, they still reasonably believed that the Plaintiffs were connected to the illegal activity at the main residence. That suspicion remained until Sergeant Barnett had interviewed the occupants from the main house and from the garage apartment. Accordingly, the plain view doctrine allows the marijuana to be considered as part of the totality of evidence supporting the challenged detentions and searches.[5]

---

[5] The dissent states that defendants "point to no facts that would provide probable cause to search Harman and Overton's home." Dissent at 8. We disagree that the officers were not lawfully in a position from which to view the marijuana. *Harman I* resolved the legality of the SERT officers' initial entry into the garage apartment. 446 F.3d at 1082. The SERT officers discovered the marijuana and pipe during or just after their securing of the apartment, which took but a few minutes. Rather than suggest the SERT officers should have retreated immediately when discovering the garage to be a dwelling without regard to the reasonable inferences made from the unique facts of this case, the touchstone is "sufficient probability." *Garrison*, 480 U.S. at 87 (internal quotation marks omitted). Given this unique set of circumstances, the Officers were "acting on

(continued...)

20

**4. The detentions and searches were not justified by exigent circumstances.**

The Officers also argue (and the district court also found) that the searches were supported by exigent circumstances. The Officers maintain that because they were already aware of the Plaintiffs' "drug involvement," having seen the marijuana, that releasing Ms. Harman and Mr. Overton would risk destruction of any further evidence of criminal activity. Aple's Br. at 42-43; *see United States v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004) (citing *Minnesota v. Olson*, 495 U.S. 91, 100 (1990)).

Upon the discovery of the marijuana, the Officers had at least reasonable suspicion to detain the Plaintiffs before contemplating a full-scale search of the garage apartment. In evaluating exigency, we consider whether the circumstances are "'subject to police manipulation or abuse,'" or "'motivated by an intent to arrest and seize evidence.'" *United States v. Zogmaister*, 90 F. App'x 325, 330-31 (10th Cir. 2004) (unpublished) (quoting *United States v. Aquino*, 836 F.2d 1268, 1272 (10th Cir. 1988); and *United States v. Smith*, 797 F.2d 836, 840 (10th Cir. 1986)).

While the sanctity of the home protects the occupants' privacy interests in the activities that take place within, the Officers could have easily secured the

[5](...continued)
facts leading sensibly to their conclusions of probability" of a connection with the main house. *Id.* at 87 n.11 (internal quotation marks omitted).

21

residence while waiting for a proper warrant. *Cf. Segura v. United States*, 468 U.S. 796, 812 (1984) (upholding the securing of premises from within, and stating that "officers who have probable cause and *who are in the process of obtaining a warrant* have no reason to enter the premises before the warrant issues, absent exigent circumstances which, of course, would justify the entry") (emphasis supplied). "[T]he heightened protection we accord privacy interests is simply not implicated where a seizure of premises, not a search, is at issue." *Id.* The "securing [of] a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Id.* at 810. We prefer "the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution . . . over the hurried action of officers." *United States v. Lefkowitz*, 285 U.S. 452, 464 (1932).

As Sergeant Barnett testified, had there been *no* separate drug investigation at the main house, and the Officers saw the pipe and marijuana in plain view, before conducting a search, they "would either get a consent to search the residence or get a search warrant for the residence." Aplts' App. vol. I, at 230.

We appreciate Sergeant Barnett's candor regarding the need for consent or a separate warrant. As noted in *Harman I*, however, the Officers here "at no time considered obtaining a separate warrant." 446 F.3d at 1088. As the Officers well

22

know, telephonic warrants (obtained pursuant to Fed. R. Crim. P. 41(c)) provide a mechanism by which officers can obtain quick judicial review of search warrant applications, and it seems obvious that such procedures may have obviated much of this litigation. And in their brief, the Officers maintain that "[w]ere a magistrate to reevaluate the warrant with the information [Agent] Pollock had at the time he performed his search, the magistrate would approve the warrant to search the garage." Aples' Br. at 41. This assertion only strengthens the conclusion that the Officers would have had no trouble obtaining an independent telephonic warrant well within the near two-hour timeframe involved here. We thus reject the argument that the Officers acted based on the exigency of the imminent destruction of evidence.

> **5.     The combined weight of the "crash pad" evidence and the marijuana discovered in the Plaintiffs' apartment satisfies the *Garrison* standard.**

Standing alone, the Officers' "crash pad" evidence and the marijuana in plain view may not have been sufficient to justify the full extent of the detention and searches under the Fourth Amendment. However, taken together, that evidence establishes that the Officers reasonably believed that the Plaintiffs were connected to the illegal activity at the main residence until they completed all of the questioning.

In reaching this conclusion, we acknowledge "'the need to allow some latitude for honest mistakes that are made by officers in the dangerous and

difficult process of making arrests and executing search warrants.'" *Harman I*, 446 F.3d at 1083 (quoting *Garrison*, 480 U.S. at 87).  As such, although the investigation was less than model work, we cannot say the Officers' actions were "plainly incompetent" or "knowing[] violations [of] the law."  *Malley*, 475 U.S. at 341.  Because we hold that the Officers' detention and searches were reasonable, we need not address the Plaintiffs' third argument regarding the personal involvement of the Officers.[6]

---

[6] We also reject the Officers' argument that Ms. Harman's "ties to New Mexico" (via her license plate) suggested her involvement with the main house's residents.  Aples' Br. at 30.  According to this theory, Ms. Harman's New Mexico license plate (bearing the motto "Land of Enchantment"), which has a "high Hispanic population and is a border state through which drugs from Mexico might pass," supported the district court's reasonableness conclusion.  *Id.*

Finally, in evaluating these matters, officers and policy makers might take note that with the proliferation of the use of SWAT teams comes the concomitant increase of mistakes a SWAT team may make, and the increased risk of accidental death, injury and the terrorizing of innocents, including children.  According to a Cato Institute study cataloguing various flawed paramilitary raids, "at least 780 cases" "reached the appellate level between 1989 and 2001," which marks a significant increase from the previous decade.  Radley Balko, *Overkill: The Rise of Paramilitary Police Raids* 43 (Cato Inst. 2006), available at http://www.cato.org/pub_display.php?pub_id=6476.  Not only do these raids test the Fourth Amendment rights of the often law-abiding inhabitants and their families, but also they are conducted with substantial firepower.  *See id.* (cataloguing botched drug raids at the incorrect address and noting that "death, injury, and terrorizing of innocents . . . aren't merely a regrettable, infrequent consequence of an otherwise effective police tactic" but instead are "the inevitable consequence of a flawed, overbearing, and unnecessary form of drug policing"); *see also Holland v. Harrington*, 268 F.3d 1179, 1197-99 (10th Cir. 2001) (expressing concern about the poor planning used by a sheriff's department to execute a "dynamic entry" raid involving only a misdemeanant and endangering the residence's several children) (Henry, J., concurring).

24

### III. CONCLUSION

We conclude that the Officers acted reasonably when they detained the Plaintiffs, suspecting they might somehow be related to the main house's drug ring. Although the view of the marijuana was fairly plain, the circumstances were not apparently exigent. While a second warrant would be the preferable route, we hold that Agent Pollock's subsequent search and his authorization of the K-9 search were reasonable, given the uncertainties regarding Ms. Harman's possible involvement and given the presence of the contraband. As stated earlier, our holding is limited to the narrow confines of this case, involving a facially valid warrant, with a legal description that included the detached garage; the plain view of marijuana and a pipe; the necessity to interview the main house residents to confirm the members of the drug ring; the presence of Ms. Harman's name on the gas bill for the main house; and the Officers' reasonable application of their expertise in sorting out the identities of and the relationships between the main house and garage apartment residents. As such, we AFFIRM the district court's grant of summary judgment to the Officers.

08-4068, <u>Harman v. Pollock</u>

**LUCERO**, J., dissenting

Because my respected colleagues fail to apply appropriate summary judgment standards and create a circuit split by failing to adhere to <u>Maryland v. Garrison</u>, 480 U.S. 79 (1987), the established Supreme Court jurisprudence that should govern this case, I must dissent.

**I**

Shortly after midnight on February 12, 2003, seven members of Utah's Special Emergency Response Team ("SERT") battered down the door of an apartment occupied by Melissa Harman and Justin Overton at 44 ½ West 2700 South, South Salt Lake City. The couple was asleep in bed—Overton unclothed and Harman in her underwear—when SERT members entered their bedroom with guns drawn. Both residents awoke in shock and fear and were immediately directed into the living room, where they were handed a single bed sheet to cover themselves and then were handcuffed to a couch. Harman was so frightened that she lost control of a basic bodily function. Officers learned that the individuals they had detained were named <u>Melissa Harman</u> and <u>Justin Overton</u>. Harman and Overton were re-handcuffed, moved to a police van and then to a second vehicle, where defendant Scott Barnett questioned them. Meanwhile, defendant Brent Pollock directed another search of Harman and Overton's apartment.

What the SERT team knew even before entering the Harman-Overton residence is that they were executing a warrant directed to "44 West 2700 South,

South Salt Lake City," the suspected home of two drug dealers named <u>Isabelle</u> and <u>Pawoo</u>. Although the warrant also described a "detached garage," it did so erroneously. There was no "garage"; in fact, the only detached building was the separate apartment, with a separate address, occupied by Harman and Overton.

**II**

"When applying [a summary judgment] standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." <u>Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.</u>, 165 F.3d 1321, 1326 (10th Cir. 1999). With all due respect to my colleagues, they have failed to apply this standard in their recitation of the facts. When viewed in the light most favorable to Harman and Overton, there can be no doubt that the officers knew immediately upon entry that the building described in the warrant as a "detached garage" was a separate residence and that in fact, there was no garage at all.

The officers proceeded in three waves, each supervised by the defendants[1]: Pollock was the case agent and Barnett his sergeant, and they had "control the entire time." First came the SERT team. Immediately upon entry, the SERT team knew they were not in a garage. They knew that they were in an apartment. These seven officers were followed within approximately five minutes by a team

---

[1] Pollock and Barnett's supervision included maintaining constant radio contact with all law enforcement on the scene. In addition to enabling direct communication, the radios allowed Pollock and Barnett to "overhear . . . conversations going back and forth" among officers.

2

of investigating officers led by Barnett. These officers also immediately observed that the garage was, in fact, an apartment. The defendant supervisors ordered a third wave, the K-9 unit. The plaintiffs were kept in detention for an additional hour and a half until the K-9 search was completed and the police issued Harman and Overton a citation for possession of marijuana.

Investigating officers and SERT members executing the warrant overwhelmingly testified that the Harman-Overton dwelling was clearly an apartment. One officer provided the following deposition testimony:

Q. Was it obvious to you that it was an apartment, a kitchen and things like that?

A. Uh-huh (affirmative), yeah.

Q. Was there any question in your mind that you were looking at a residence when you walked in there?

A. No. Once I was in there, no.

A second member of the search team similarly testified:

Q. Did it look like a garage to you?

A. No, it was kind of—kind of a seedy apartment, kind of run down.

Q. Run-down, seedy apartment?

A. Uh-huh (affirmative).

Q. Okay. And it was obvious to you right away when you walked in, right?

A. From the inside, yes.

The same officer confirmed that he knew the apartment was "[s]omebody's living quarters" within "a few seconds of when [he] walked in."

Testimony of other law enforcement officials on the scene corroborates the fact that Harman and Overton's home was "obvious[ly]" an apartment. One

3

SERT member stated it "was obvious it was an apartment. It was obvious people were living in there as some kind of an apartment." Daniel Fuhr, the team leader for the search, testified, "Someone was living there. It was obvious." Fuhr also testified that he "w[as] concerned that it might be a residence" before the search even began, and that he warned Pollock of his concern.

Several officers testified that they were surprised to find an apartment rather than a garage. One stated he "was surprised that there was a living quarter back over there because our information that we got, it was a garage." Another officer, when asked whether "it looked like it could be some sort of an apartment," responded, "Once I got in, yeah. It actually surprised me that it was."

Ignoring the obvious, the defendants tell a different tale. Pollock averred that he saw "no indication that [the apartment] was a secondary residence." Instead, he testified that he believed "maybe they were just out in the garage partying." A jury might be free to credit this testimony; we are not. In reviewing a grant of summary judgment in favor of defendants, we must apply summary judgment jurisprudence and assume that it was "obvious" that Harman and Overton's home was an apartment and that this fact was clear to law enforcement as soon as they broke down the door.

### III

Although the majority fails to recite the pertinent facts in the light most favorable to the plaintiffs, its more serious mistake is in misreading <u>Maryland v.</u>

4

Garrison.[2]  In Garrison, the Supreme Court spoke clearly and unambiguously: Police are "required to discontinue the search . . . as soon as they discover[] that there [a]re two separate units . . . and therefore [a]re put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." 480 U.S. at 87.

Instead of applying Garrison, the majority opinion stands it on its head. What Garrison requires is for officers to "discontinue the search" once they were "put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant," id.; the majority instead rules that henceforth officers may detain individuals and continue the search of a home erroneously included in a warrant until the detainees can prove to the officers that they are "unconnected to the illegal activity described in the warrant," (Majority Op. 12-13 (quoting Garrison, 480 U.S. at 87).)  In other words, my colleagues require plaintiffs to satisfy police that their separate apartment was not serving as a "crash pad" for their drug dealing neighbors before a search and detention need be ceased.  That is simply not the standard under clearly established Fourth Amendment law.  And this is not a state of affairs that should be allowed to exist under our Constitution.

## A

In Garrison, police had a valid warrant to search the "third floor apartment" of a building.  480 U.S. at 80.  In executing the warrant, police learned that the

---

[2]  I agree with the majority that Garrison, rather than Terry v. Ohio, 392 U.S. 1 (1968), provides the appropriate framework for determining the constitutionality of defendants' actions.  (Majority Op. 12-13 & n.2.)

5

third floor actually contained two separate apartments, only one of which belonged to the person being investigated.  Id.  While searching the apartment erroneously named in the warrant—under the reasonably mistaken belief that they were searching the suspect's apartment—police discovered and seized contraband.  Id.  Police immediately discontinued their search after realizing they were not in the suspect's apartment.  Id. at 81.  The Supreme Court held that the contraband was not obtained in violation of the Fourth Amendment because it was discovered before police would have reasonably realized their mistake.  Id. at 86.  Had the timing been reversed, so too would have been the outcome:

> [A]s the officers recognized, they were required to discontinue the search of [defendant's] apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant.  The officers' conduct and the limits of the search were based on the information available as the search proceeded.

Id. at 86-87.

Once put on notice that they are searching a second apartment under a warrant authorizing the search of only a single home, police may continue searching the second apartment only if: (1) they procure an additional warrant or (2) both probable cause and exigent circumstances exist.  See id.; United States v. Karo, 468 U.S. 705, 714-15 (1984) ("Searches and seizures inside a home without a warrant are presumptively unreasonable absent exigent circumstances.").  As one circuit court has explained, upon realizing there is a second apartment, police are "obligated to either limit the search to those areas clearly covered by the

6

warrant or to discontinue entirely their search." United States v. Ritter, 416 F.3d 256, 266 (3d Cir. 2005). Police may not, as the majority suggests, continue searching the second apartment until they rule out the possibility that its residents are in some way connected to the illegal activity being conducted in a nearby home. The majority-created law enforcement right to <u>confirm</u> that an apartment is unconnected to illegal activity occurring elsewhere before discontinuing a search, (Majority Op. 17-18 n.4), is antithetical to law enforcement's duty to immediately discontinue searching when put on notice of a <u>risk</u> that an apartment was erroneously included in the warrant, <u>Garrison</u>, 480 U.S. at 87.

<u>Garrison</u> strikes a measured balance between the sanctity of the home and "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants."[3] 480 U.S. at 87. The majority upsets that balance by rejecting the <u>Garrison</u> test of a "unit erroneously included within the terms of the warrant," <u>id.</u>, instead substituting a dramatically looser "unconnected to the illegal activity described in the warrant" standard. (Majority Op. 12-13.)

**B**

It is not only the plain text of <u>Garrison</u> that contradicts the majority's analysis; a review of <u>Garrison</u>'s underlying principles leaves no doubt that the

---

[3] Contrary to the majority's assertion, searching Harman and Overton's home two additional times and detaining them for approximately two hours after discovering the separate apartment in which they were residing was not a garage cannot be classified as an "honest mistake." (Majority Op. 17-18 n.4, 23.)

7

grant of summary judgment in the case before us was erroneous. Garrison is merely a particular application of the general rule that police cannot rely on a warrant after learning facts that vitiate probable cause. "[O]nce the mistake is discovered, the government cannot use the authority of the warrant, or of the order, to conduct a search or interception that they know is unsupported by probable cause or is otherwise outside the scope of the statute or the Constitution." United States v. Ramirez, 112 F.3d 849, 851-52 (7th Cir. 1997) (citing Garrison, 480 U.S. at 87); see also United States v. Bowling, 900 F.2d 926, 933 (6th Cir. 1990). Consequently, the appropriate Fourth Amendment analysis is not whether two apartments are somehow connected, as the majority contends, but whether police knew or reasonably should have known that they lacked probable cause to search the second apartment based on knowledge gained during the execution of the warrant. The defendants here point to no facts that would provide probable cause to search Harman and Overton's home. Consequently, the search was unconstitutional.

Moreover, defendants clearly lacked probable cause to search Harman and Overton's home once they discovered it was an apartment. It has long been the rule that "[p]robable cause must be shown for searching each house or, in this case, each apartment." United States v. Hinton, 219 F.2d 324, 325-26 (7th Cir. 1955); see also United States v. Perez, 484 F.3d 735, 741 (5th Cir. 2007); Shamaeizadeh v. Cunigan, 338 F.3d 535, 552-53 (6th Cir. 2003); Mena v. City of Simi Valley, 226 F.3d 1031, 1038 (9th Cir. 2000); United States v. Rios, 611 F.2d

8

1335, 1347 (10th Cir. 1979), disapproved on other grounds in United States v. Young, 470 U.S. 1, 14 n.11 (1985).  An apartment is entitled to the heightened Fourth Amendment protections afforded to any home.  Once law enforcement discover that a unit is an apartment, they are no longer free to treat it as an outbuilding or garage, no matter the wording of the warrant.  To reiterate, on summary judgment, we must credit testimony from law enforcement that the building did not look like a garage, but appeared to be an apartment.

To determine whether probable cause existed to search the plaintiffs' residence, one need simply consider whether the magistrate would have issued a warrant to search the apartment if provided the information that police immediately discovered upon entering Harman and Overton's home.  Obviously, the magistrate would not have done so.  If the affidavit had accurately described Harman and Overton's home as an "apartment" rather than a "detached garage," then the magistrate would have required distinct probable cause to search the apartment.  But nothing in the affidavit suggests that evidence of illegal activity would be found in the apartment.[4]  The belief that the building was a garage was in error, and proximity is insufficient to create probable cause.  See Ybarra v. Illinois, 444 U.S. 85, 91 (1979) ("[M]ere propinquity to others independently

---

[4] The fact that Harman's name was listed on the gas utility statement for the main residence may be relevant to whether the warrant was overbroad when issued.  But it assuredly is not relevant to the inquiry of whether probable cause continued to exist after officers discovered the detached garage was a separate residence.

9

suspected of criminal activity does not, without more, give rise to probable cause

. . . .").

The majority dodges the foregoing analysis. Rather than considering

whether police knew they lacked probable cause to search the subject apartment,

the majority holds that Pollock's inchoate suspicion that Harman was "just

somehow intertwined with this" justified what amounts to the warrantless search

of a home. No officer could reasonably believe that such a hunch provides

probable cause. See United States v. Concepcion-Ledesma, 447 F.3d 1307, 1316

(10th Cir. 2006) (probable cause requires "a particularized and objective basis for

suspecting legal wrongdoing" (quotation omitted)).[5]

A reasonable jury could determine defendants directed the detention of

Harman and Overton and two searches of their home long after being put on

notice that they lacked any legal basis to do so. Therefore I would hold that

---

[5] In addition to Pollock's hunch, the majority relies on the discovery of a small amount of marijuana to justify defendants' actions. The majority does recognize the evidence showing that the contraband was not discovered until after SERT members secured the home, but fails to legally credit the consequence of these facts in its analysis. (Majority Op. 19-20.) Viewing this evidence in the light most favorable to plaintiffs, the discovery occurred after defendants knew the "detached garage" was actually an apartment, which was immediate. Because police were obligated to withdraw as soon as they discovered the fact that they had entered an apartment, they were not "lawfully in a position from which the [marijuana] was in plain view"; thus the marijuana may not be considered. United States v. Angelos, 433 F.3d 738, 748 (10th Cir. 2006) (quotations omitted). Only by holding that the officers could continue their search until Harman and Overton proved that they were not "connected to the illegal activity" at the nearby home can the majority bring the seizure of the marijuana within the plain view exception. (Majority Op. 20.)

10

plaintiffs met their summary judgment burden of showing a Fourth Amendment violation.

## IV

Because the majority opinion holds Harman and Overton failed to create a genuine dispute as to whether defendants violated the Fourth Amendment, it does not address whether plaintiffs' claims are grounded in clearly established law. I would hold that they are. Prior to the majority's decision in this case, the law was well settled that police are "required to discontinue the search" immediately upon being "put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." Garrison, 480 U.S. at 87. When defendants executed the warrant in this case, Garrison had been the law for more than fifteen years. This Supreme Court precedent should have made the contours of the Fourth Amendment "sufficiently clear" to the defendants. Anderson v. Creighton, 483 U.S. 635, 640 (1987). Indeed, in an earlier appeal of this case, the parties did not dispute that "the law in this area was well-established at the time of the search in question." Harman v. Pollock, 446 F.3d 1069, 1077 (10th Cir. 2006) (quotation omitted).

## V

Viewing the evidence presented in the light most favorable to the non-moving parties, the plaintiffs have demonstrated: (1) that a reasonable jury could determine that defendants violated the Fourth Amendment; and (2) that the rights

11

at issue were clearly established at the time of defendants' unlawful conduct.
Consequently, I would reverse the grant of summary judgment.